JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Jameel Talley ("appellant") appeals from his conviction for involuntary manslaughter, in connection with the death of Guy Wills, III. For the reasons set forth below, we affirm.
 {¶ 2} On November 21, 2002, defendant was indicted for murder in violation of 2903.02(B), and involuntary manslaughter for causing a death during the commission of a felony in violation of R.C. 2903.04(A). He pled not guilty and the matter proceeded to a jury trial on April 28, 2003.
 {¶ 3} Willie Moore, support manager at Dillard's Department Store at Randall Park Mall, testified that he arrived at work at approximately 1:00 p.m. on November 9, 2002, and performed a "walk around" of the store. As he passed through the double doors leading to the security area, interview room and employee break room, he observed defendant, a security guard at the store, kneeling over a man, later identified as Guy Wills, with his right knee on Wills's back. Wills's chest was downward and his head was smashed against the wall. One of Wills's wrists was in handcuffs and he appeared to be wriggling his other arm. According to Moore, defendant ordered Wills to stop resisting. Wills insisted that he was not resisting and did not steal anything. Defendant then picked Wills up and slammed him down on the floor, causing Wills to strike his face, shoulder and ribs. Wills became unconscious. Defendant then picked him up, handcuffed him and put him in a chair.
 {¶ 4} Wills appeared to come to a short time later. He was bleeding and his head began to swell. Defendant requested emergency assistance and Moore summoned store manager Frank Monaco and second in charge boss Larry Sims. Captain Davis of the North Randall Police Department, who was working security at the mall, also arrived a short time later. Emergency technicians asked what had happened and defendant stated that Wills fell out of his chair.
 {¶ 5} On cross-examination, Moore testified that he is now a department manager at Dillard's, and that he refused to speak with an investigator for the defense. Moore also admitted that he did not intervene to assist Wills even though he has a background in martial arts.
 {¶ 6} Melanie Mague, a loss prevention manager at Dillard's, testified that she was working as a camera monitor at the store on November 9, 2002, and met defendant for the first time on that day. Beginning at around noon, she and defendant sat in front of the store's video monitors. Defendant was not in uniform. According to Mague, Wills selected a leather jacket from a display then threw it back. He took another jacket from its hanger then rolled it into a smaller form and hid it in his own jacket. She remarked to defendant that Wills was "going to do it," and she continued to operate the camera to record his actions.
 {¶ 7} Defendant led Wills from the sales floor. Mague observed Wills struggling and watched defendant place him in a bear hug. Defendant repeatedly told Wills to stop resisting. Mague called the police and mall security in order to provide assistance for defendant. When Mague returned to the area, she observed Wills lying on the floor.
 {¶ 8} On cross-examination, Mague testified that she did not observe defendant kick, punch, head butt or choke Wills.
 {¶ 9} Dock worker Richard Chappell testified that on November 9, 2002, he was asked to clean two blood smears outside the store's detention area.
 {¶ 10} Store manager Frank Monaco testified that the store uses off-duty police for security. Store policy mandates that they patrol the sales floor in uniform, but he conceded that an officer reporting out of uniform may be permitted to work. If there is probable cause to stop someone for taking merchandise, the officer is to detain the person and inquire about the merchandise.
 {¶ 11} Monaco further testified that defendant had worked as a part-time security officer for a short time in 2002, and was re-employed on November 9, 2002. A second officer was also scheduled to work on this day but called off sick.
 {¶ 12} At approximately 1:30 p.m., Monaco received a call to report to the area outside the security office. He and Larry Sims went to the area and observed paramedics attending a man who was seated in a chair. Monaco asked Wills how he got the cut above his eye and Wills told Monaco that he had been resisting arrest and indicated that he had struck his head on nearby lockers. Monaco noticed a lump near Wills's collar bone.
 {¶ 13} Monaco had defendant and other employees prepare statements describing what had happened. Defendant's statement indicated that he had struggled with Wills, lost his balance, and both men fell. Monaco informed defendant that his statement of events differed from statements of other witnesses, and defendant reportedly stated that he stood by his account.
 {¶ 14} Monaco read the statement into the record. In relevant part, the statement provided that, after defendant approached Wills, Wills became hostile, resisted defendant's order to go into the security room and that the two men struggled outside the room. Defendant then reportedly fell, causing Wills to fall to the floor and sustain a cut to his eye. Upon further questioning by Monaco, defendant denied that Wills's feet ever left the floor. Defendant then indicated that, because the store had scheduled a single officer to work for a portion of the shift, he no longer wanted to work there.
 {¶ 15} Monaco retrieved the leather jacket that Wills had taken and determined that the price of the garment was $159.
 {¶ 16} On cross-examination, Monaco admitted that the store prefers to have police officers as its security officers because of their training and experience, and that Dillard's is concerned about civil litigation resulting from this matter.
 {¶ 17} Robert Viancourt, a patrolman for the Village of North Randall, testified that he responded to a call to assist an officer with a robbery suspect at the mall. In the area near the security office and the rest rooms, he observed a man lying face down on the ground, and defendant kneeling over him and attempting to handcuff him. Officer Viancourt helped defendant handcuff the man and they then placed him in a chair.
 {¶ 18} Viancourt noticed a bump on the right side of the man's head. EMS responded and treated him briefly at the scene then transported him to Meridia Hospital. Viancourt remained with the man while he was treated, and observed him communicate with hospital workers, and also ask to be taken to the Warrensville Heights Jail so that he could obtain a bond. Later, Viancourt advised the man's doctor that he was repeating the same questions. The doctors examined Wills and x-rayed him. Viancourt was relieved by another officer while Wills was still in the hospital.
 {¶ 19} Sales manager Cassandra Maddox testified that at approximately 1:00 p.m., she went to the store's pits room, near the security office, in order to respond to a page, and heard scuffling. She heard the defendant ordering someone to stop resisting and heard banging into lockers. Next, she heard a loud thump which she thought was from something hitting the concrete floor. She looked out into the hall and saw a man lying at an odd angle, and he seemed to be convulsing and shaking. According to Maddox, defendant stood over the man and said, "See if you can resist now." (Tr. 549).
 {¶ 20} On cross-examination, Maddox admitted that she did not see what defendant or the man were doing before she heard the thump.
 {¶ 21} Assistant store manager Larry Sims testified that each Dillard's employee receives an orientation kit which contains various store policies. Defendant signed for receipt of his orientation kit on November 7, 2002. One of the policies indicates that if anyone resists apprehension for shoplifting, they should be let go. Security guards are instructed to handcuff and detain shoplifters if it is possible to do so. Sims further testified that, at approximately 1:10 p.m., he received a call from Cassandra Maddox and Willie Moore. He and Frank Monaco went to the area near the security office. Sims observed Wills sitting in a chair, and receiving assistance from paramedics. It appeared that his collarbone was broken and was protruding from his clothes. A small puddle of blood was on the floor nearby. According to Sims, Wills told Monaco that he was resisting and he hit his head on some lockers.
 {¶ 22} On cross-examination, Sims testified that it is absolutely clear that Wills was shoplifting prior to being apprehended by defendant, and that defendant did not violate store policy by confronting Wills inside the store. In addition, he admitted that a security officer might be justified in patting down a suspect for weapons. Finally, he stated that he did not see Wills sustain his injuries.
 {¶ 23} Captain David Davis of the North Randall Police Department testified that defendant became employed by the North Randall Police Department in June 1998, and that he and defendant are friends. Davis also responded to the call for assistance at Dillard's. As he proceeded through the double doors leading to the security office, Davis observed a man lying face down and bleeding from the head. EMS arrived to attend to the man and Davis spoke to defendant. He noticed that defendant was out of breath and perspiring, and it appeared that he had been involved in a physical confrontation. Wills appeared agitated, asked about getting a bond and said that he wanted to leave.
 {¶ 24} Davis asked employee Robin Lewis to prepare a statement. According to Davis, Lewis seemed upset and said, "I can't believe what I just saw," (Tr. 616), and Moore said that defendant grabbed him behind the leg and by the shoulder and dumped him on his head. (Tr. 619). Davis then began to investigate defendant's conduct and also helped prepare an arrest warrant charging Wills with theft and resisting arrest.
 {¶ 25} Davis subsequently learned that Wills was released from the hospital and sent to the jail. He was subsequently advised that Wills was experiencing heroin withdrawal symptoms and he was released on personal bond.
 {¶ 26} On cross-examination, Davis admitted that when officers are called to Dillard's to pick up suspected shoplifters, they bring all of their usual issue weapons and they pat the suspect for weapons. In the off-duty Dillard's assignment, officers have no such weapons, however.
 {¶ 27} Davis further admitted that the officers called EMS for Wills after he began vomiting but Wills declined further medical treatment.
 {¶ 28} Scott Hantz of the North Randall Fire Department testified that he was working as an Emergency Medical Technician on November 9, 2002. As such, he was not permitted to perform any invasive medical procedures, and was, essentially, restricted to picking up the injured person and transporting them to the hospital. According to Hantz, Wills had minimal bleeding from his forehead, and a deformity on his clavicle, but did not want to go to the hospital.
 {¶ 29} On cross-examination, Hantz indicated that the run report indicates that Wills was "shoplifting at Dillard's, fought with the company cop, hit his head on the locker * * *." (Tr. 673). The run report further indicates that Wills was alert, responsive to stimuli and breathing on his own.
 {¶ 30} Dr. Frank Miller, a forensic pathologist with the Cuyahoga County Coroner's office, testified that he performed an autopsy on Wills on November 12, 2002. Wills was 140 pounds and was 5'11". With regard to external injuries, the body displayed evidence of an injected drug habit, a three-fourths inch laceration above his left eye with bruising, hemorrhage in the conjunctival portion of his eye, a nine-by-five inch contusion in the upper part of the left shoulder above the collarbone, and a laceration of his scalp. With regard to internal injuries, Dr. Miller testified that Wills had a skull fracture to his left frontal and temporal bone, head injuries, bleeding on the outside of the dura on the left side of the brain, subarachnoid hemorrhage on the right side of the brain, and brain swelling. According to Dr. Miller, head injuries were due to one impact which had caused a contrecoup injury or an injury on the opposite side of the impact caused by a rebound effect within the skull.
 {¶ 31} Dr. Miller further testified that head injury may render a victim immediately unconscious or may result in bleeding and swelling which manifest symptoms three days later. In the latter instance, the person would experience a lucid interval following the injury.
 {¶ 32} Dr. Miller also testified that there was a fracture in the thyroid cartilage and this injury is consistent with compression of the neck, and was consistent with Wills having been lifted and thrown head first into a cement floor. The death was ruled a homicide. Finally, Dr. Miller testified that the toxicology report was positive for phenytoin, an anti-seizure drug, which was presumably given to Wills as part of his last medical treatment, heroin, the breakdown drugs of cocaine, morphine, and codeine. On cross-examination, Dr. Miller admitted that the hospital's toxicology report was positive for cocaine and heroin. In addition, the fracture was detected during x-rays taken when Wills was first brought to Meridia. Defendant was pronounced dead at 2:58 p.m. on November 11, 2002. Finally, Dr. Miller admitted that Wills's spine had not been fractured and that there are a number of ways in which he could have sustained his injury.
 {¶ 33} William Johnson testified that he was working at Dillard's as a floor associate on November 9, 2002. At approximately 1:00 p.m., he was in the employee lunch room on the second floor near the security office, and spoke to Robin Lewis. He then heard a man in the hall yelling, "Let me go, I didn't take anything." (Tr. 794). Johnson observed defendant take the man by the collar and lead him into the holding room. The man attempted to flee and he and defendant scuffled. The man continued to attempt to get away and defendant brought him down to the floor and attempted to handcuff him. The man continued to struggle with defendant. Defendant then picked the man up and slammed him to the floor, causing him to strike the left side of his head and his shoulder. The jolt appeared to render the man unconscious. According to Johnson, at no time did the man do anything to jeopardize defendant's safety.
 {¶ 34} Johnson observed blood on the floor and blood on the man's head. He immediately returned to the sales floor, but later prepared a statement for police.
 {¶ 35} On cross examination, Johnson admitted that, while he was still attending school, he disobeyed an order of a police officer, and fled from the officer. He scuffled with the officer when he was apprehended, and the officer indicated that he would be charged with assault. Johnson admitted that he believed that the officer had lied about the incident and that he ultimately pled guilty to misdemeanor assault. He also had previous "experiences" with the police which resulted in adverse consequences.
 {¶ 36} Johnson also admitted that he did not observe defendant punch, kick or choke Wills.
 {¶ 37} Dr. Matt John Likavec, the director of neurological surgery at Metrohealth Medical Center ("Metro") stated that he has testified as an expert 15 to 20 times in a variety of matters. After reviewing the autopsy report, medical records, eyewitness statements and the statement of the arresting officer, Dr. Likavec opined that Wills died from a severe trauma to his brain. He developed a blood clot which caused increased pressure inside his head and impaired blood flow to his brain. According to Likavec, Wills suffered a severe blow to the left side of his head which caused a crack in his skull, a small blood clot to the left side of his brain, a larger blood clot to the right side of his brain which increased in size and caused an increase in pressure and decrease in blood flow. The injury was due to very significant force and is similar to what would occur in connection with an acceleration-type impact. If he had simply fallen, the injury would not have been as severe and bruises to other parts of the body would be likely. Dr. Likavec further testified that, if Wills had received immediate treatment from a level one trauma center, he would have had a 40%-50% chance of survival.
 {¶ 38} On cross-examination, Dr. Likavec admitted that his conclusions in this matter differ from those reached by Dr. Wecht, the Allegheny County Coroner. He further admitted that Wills had received no medical treatment for his head injury for many hours after the impact, and that a patient presenting with such injury could be given medication, and have an operation to remove the clot.
 {¶ 39} Dale Canter, former Chief of Police of Maple Heights, testified that defendant worked as a corrections officer at the Maple Heights jail. Canter implemented a use of force policy which describes the level of force which may be used in effecting an arrest. Under this policy, the force corresponds to the threat which the officer reasonably perceives. If physical force appears to be required, the officer is to call for back-up assistance. The policy also defines unnecessary force as that which is neither necessary nor appropriate and which is implemented as summary punishment or for vengeance. Head strikes are permitted when it is the only option available for defense. The use of force policy is similar to that promulgated by the Ohio Peace Officer Training Academy ("OPOTA"). In accordance with the OPOTA policy, permissible modes of responding to suspect noncompliance include taking the suspect down and striking large muscle groups. Deadly force is a method of last resort.
 {¶ 40} On cross-examination, Canter admitted that the officer must make the best decision he can as the matter unfolds. He also admitted that if a detained shoplifting suspect began to protest, and move around, there would be concern that he would attempt to escape, and the officer would need to gain control over him. This is a dangerous scenario for an officer, especially if it were a one-on-one confrontation. The suspect's behavior generally dictates the amount of force which the officer has to use. In addition, even if the suspect were lying on the ground, but continuing to struggle, it could be perilous for the officer and it may be appropriate to use the suspect's momentum against him in that scenario. Options are also limited in the absence of police-issued weapons.
 {¶ 41} Robin Lynn Lewis, a former sales associate for Dillard's, testified that she ate lunch in the employee lunch room at noon on November 9, 2002, and spoke to William Johnson. They heard yelling in the hallway so Lewis looked out and saw defendant and Wills scuffling near the security office. Defendant appeared to slip then got Wills to the ground. Wills was on his stomach but was still wiggling around as defendant attempted to handcuff him. According to Lewis, defendant did not attempt to grab or twist Wills's arm. Instead, defendant picked Wills up, raised him in the air and slammed him to the floor. Wills lay shaking and bleeding and Lewis cried out for someone to call for an ambulance. Defendant stood over Wills and said, "You can't resist now, can you?" He then threw Wills into a chair.
 {¶ 42} On cross-examination, Lewis admitted that, in a written statement, she indicated that Wills had tried to run before being handcuffed.
 {¶ 43} Cuyahoga County Coroner Elizabeth Balraj testified that her office received Wills' body. He had a laceration above his forehead which had been sutured, bruises on his knees and legs, a bruise on his left shoulder and chest. He also had sustained a skull injury, there was also bruising and epidural and subdural hemorrhage on the brain, and it appeared that he had sustained a contracoup injury. The death was ruled a homicide. According to Dr. Balraj, the injuries were consistent with Wills being thrown to the ground, and not simply falling. The injuries were lethal and severe and any subsequent failure to treat him "need not be the cause of his death." (Tr. 1178).
 {¶ 44} On cross-examination, Dr. Balraj testified that the autopsy protocol had been prepared by Dr. Miller, and that no tests were conducted to determine the force employed. She also acknowledged that Wills had cocaine and heroin in his system, and this could make him behave aggressively, or unpredictably. In addition, although the death had been ruled a homicide, the jury had the ability to decide whether it was justifiable.
 {¶ 45} Det. Joseph Greene of the Cleveland Heights Police Department testified that he is a subject control instructor at the Cleveland Heights Police Academy and he was trained by Sam Faulkner of the Office of the Attorney General. The academy is open to cadets from other departments. Cadets receive 32 hours of instruction and must pass written and practical tests. Head strikes are not favored and cadets are not taught them. They are also not advised to release control over a suspect who is struggling. Cadets are not taught to throw suspects to the ground, and such force would not be reasonable or justified. Instead, cadets are instructed to apply force to motor points on the body, if necessary.
 {¶ 46} Sam Faulkner, a law enforcement training specialist with the OPOTA, testified that he reviewed various eyewitness statements which were made in this matter, the autopsy photos, the store surveillance videotape, and other documents. According to Faulkner, defendant properly led Wills from the sales floor, and, following Wills's initial noncompliance, was correct and reasonable in forcing Wills to the floor and putting his knee on Wills's back. For further noncompliance, he should have applied force to a pressure point such as his leg or shoulder. A head strike to the floor is only authorized if the officer is confronted with a deadly force situation, and is otherwise unreasonable.
 {¶ 47} On cross-examination, Faulkner admitted that the force guidelines are for police officers who have weapons, and not just handcuffs. Officers are reactive to the actions of suspects, and officers have been killed even while apprehending suspects for minor offenses. The officer's action must be considered from the perspective of a reasonable officer coping with a quickly-evolving situation. Faulkner also admitted that officers who are involved in deadly force situations often experience difficulties with perception.
 {¶ 48} Defendant elected to present evidence and offered the testimony of John Anderson, Timothy Cannon and James Simone.
 {¶ 49} John Anderson, a twenty-five year veteran of the Cleveland police, testified that he worked for ten years as a defensive tactic instructor at the police academy and also worked as a consultant with the Cleveland Law Department on reasonable force issues. Anderson reviewed the coroner's report, autopsy photographs and witness statements. According to Anderson, Wills's injuries were inconsistent with the state's version of the manner in which he was injured. Specifically, Wills would have had defensive wounds on his hands. Anderson also opined that Wills's neck injury could have occurred while struggling with defendant if Wills's arm or the handcuff had become entrapped during the struggle. Anderson did not believe that it would have been possible for defendant to pick Wills up from the ground during the struggle then throw him to the ground. In particular, he believed that since defendant was not able to cuff both hands, it is illogical to assume that he would be able to handle Wills in the manner alleged by the state, and such a maneuver would be extremely difficult. Moreover, defendant would not have called police if he intended to harm Wills. Further, Anderson noted that at the time of the incident, the Shaker Heights Municipal Court had issued a capias for Wills in connection with a theft charge and this may have further induced him to resist arrest. Finally, Anderson opined that defendant simply reacted to Wills's force then redirected his momentum. The situation was dangerous for defendant because it was unclear whether Wills had a weapon.
 {¶ 50} On cross-examination, Anderson admitted that officers are instructed as to the force continuum as part of their instruction on reasonable force. He further admitted that, in his statement, defendant did not indicate that he was unable to cuff Wills. Anderson also acknowledged that deadly force is not to be applied simply to effect an arrest or prevent an escape.
 {¶ 51} Timothy Cannon, a commander at the Cleveland Heights Police Academy, testified that cadets are required to run 100 yards and move a 140-pound dummy 30 feet. It typically takes a cadet ten or fifteen seconds to move the dummy and he has never once seen a cadet lift the dummy over his or her head. As to the instant matter, Cannon found it significant that defendant did not hit, punch or choke Wills and immediately called for emergency assistance. According to Cannon, any omissions in defendant's report could be due to the stress of the encounter.
 {¶ 52} On cross-examination, Cannon admitted that, although he did not believe the state's witnesses as to how the injury occurred, such conduct, if it happened, is unreasonable force.
 {¶ 53} James Simone, a thirty-one year veteran of the Cleveland Police Department, testified that in police work, every encounter is different, and he has been assaulted numerous times. According to Simone, it is crucial for the officer to effectuate the arrest and protect himself. If an individual resists, he or she typically continues to do so throughout the encounter. If an officer has a suspect down, any further ground struggle is safer for the officer than a face-to-face confrontation.
 {¶ 54} On cross-examination, Simone admitted that deadly force should be used only if the officer's life or the life of others is endangered. Simone also admitted that he had been involved in four fatalities.
 {¶ 55} Defendant was subsequently convicted of the offense of involuntary manslaughter in violation of R.C. 2903.04(A), and the trial court sentenced him to three years imprisonment. Defendant now appeals and assigns five errors for our review.
 {¶ 56} Defendant's first and second assignments of error are interrelated and state:
 {¶ 57} "The failure to instruct the jury on the lesser included offense of involuntary manslaughter via death resulting from misdemeanor assault denied Officer Talley his federal and state constitutional rights to trial by jury and due process guaranteed by the Sixth and Fourteenth Amendments as well as Article I, Section 10 of the Ohio Constitution."
 {¶ 58} "The failure to instruct the jury on the lesser included offense of negligent homicide denied Officer Talley his federal and state constitutional rights to trial by jury and due process guaranteed by the Sixth and Fourteenth Amendments as well as Article I, Section 10 of the Ohio Constitution."
 {¶ 59} Within these assignments of error, defendant asserts that the trial court committed prejudicial error in failing to instruct the jury on the lesser included offenses of involuntary manslaughter (a death resulting from misdemeanor assault) and negligent homicide.
 {¶ 60} In order for an offense to be a lesser-included offense of another, the offense must: (1) carry a lesser penalty than the other; (2) as statutorily defined always be committed whenever the greater is committed; and (3) consist of one less element than the greater. State v. Deem (1988),40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus. Even when this test is met, a charge on the lesser-included offense is not warranted unless the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense. State v. Koss (1990),49 Ohio St.3d 213, 218, 551 N.E.2d 970. When the test is not met, the facts and the evidence of the case are irrelevant. Id.
 {¶ 61} INVOLUNTARY MANSLAUGHTER {¶ 62} The Ohio Supreme Court has held that involuntary manslaughter under R.C. 2903.04 is a lesser included offense of murder, in violation of R.C. 2903.02. State v. Lynch,98 Ohio St.3d 514, 526, 787 N.E.2d 1185, 2003-Ohio-2284. In State v.Davis, Clark App. No. 2002-CA-43, 2003-Ohio-4839, the court likewise stated that "involuntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or misdemeanor." Accord State v. Thrall (Nov. 30, 1998), Stark No. 97-CA-0434, citing State v. Kidder (1987),32 Ohio St.3d 279, 513 N.E.2d 311; State v. Lawrence (Dec. 19, 1997) Montgomery App. No. 16317.
 {¶ 63} Moreover, involuntary manslaughter under R.C.2903.04(B) is a lesser included offense of involuntary manslaughter under R.C. 2903.04(A). State v. Turner (Aug. 4, 2000), Montgomery App. No. 18026.
 {¶ 64} The culpable mental state necessary for an involuntary manslaughter conviction under R.C. 2903.04(A) is the culpable mental state necessary for the underlying felony offense. SeeState v. Brown (June 27, 1996), Cuyahoga App. No. 69149; Statev. Malone (Jan. 20, 1994), Cuyahoga App. No. 63604. The culpable mental state necessary for an involuntary manslaughter conviction under R.C. 2903.04(B) is the culpable mental state necessary for the underlying misdemeanor offense. See State v. Lutman (June 30, 1999), Lucas App. No. L-97-1447.
 {¶ 65} In this matter, defendant asserts that the jury should have been instructed on the lesser included offense of involuntary manslaughter under R.C. 2903.04(B) because "a reasonable juror could have concluded that Officer Talley committed simple assault[.]" Appellant's Brief at 6. This offense is defined in R.C. 2903.13, which states that "no person shall knowingly cause or attempt to cause physical harm to another[.]"
 {¶ 66} We do not agree with defendant's argument as we do not find that the jury could have reasonably acquitted defendant of involuntary manslaughter under R.C. 2903.04(A) while finding him guilty of involuntary manslaughter under R.C. 2903.04(B), in light of the magnitude of the force which defendant applied to Wills. The record reveals that defendant assaulted Wills with such a magnitude of force that Wills suffered a severe blow to the left side of his head which caused a crack in his skull, a small blood clot to the left side of his brain and a contrecoup injury to the opposite side. The injury was due to very significant force and was so extreme, especially in light of their disparities in size, that defendant should have known that it would have probably resulted in serious physical injury to Wills. Cf. R.C. 2901.22(B); R.C. 2901.01(A); R.C. 2903.11. We are convinced that reasonable minds could not have found that defendant lacked a subjective awareness that serious physical harm would have resulted. Accordingly, an instruction on involuntary manslaughter based upon R.C. 2903.04(B) was not warranted. Accord State v. Turner (Aug. 4, 2000), Montgomery App. No. 18026; Accord State v. Lawrence (Dec. 19, 1997), Montgomery App. No. 16317; State v. Bealer, Butler App. No. CA2002-03-056, 2003-Ohio-2114.
 {¶ 67} The first assignment of error is without merit.
 NEGLIGENT HOMICIDE {¶ 68} Negligent homicide is defined in R.C. 2903.05, as follows:
 {¶ 69} "(A) No person shall negligently cause the death of another * * * by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code." Murder as defined in R.C. 2903.02 contains no such element. Accordingly, it has been repeatedly held that negligent homicide is never a lesser included offense of murder. State v. Koss (1990),49 Ohio St.3d 213, 551 N.E.2d 970; State v. Stewart (1991),75 Ohio App.3d 141, 598 N.E.2d 1275; State v. Eubank (1987),38 Ohio App.3d 141, 528 N.E.2d 1294; State v. Hill (1987),31 Ohio App.3d 65, 508 N.E.2d 1038. Accord State v. Ford (July 10, 2000), Stark App. No. 1999CA00177; State v. Shirk (Nov. 4, 1997), Franklin App. No. 97APA03-390. As such, the trial court correctly refused to instruct the jury on negligent homicide.
 {¶ 70} The second assignment of error is without merit.
 {¶ 71} Defendant's third assignment of error states:
 {¶ 72} Within this assignment of error, defendant asserts that the prosecuting attorney committed misconduct in his closing argument regarding "putting the jurors in the shoes of the victim," (Tr. 1778) and to send a message. (Tr. 1795).
 {¶ 73} Parties are generally granted wide latitude in closing arguments, and the question as to the propriety of these arguments is generally left to the sound discretion of the trial court. State v. Maurer (1984), 15 Ohio St.3d 239, 266,473 N.E.2d 768. The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883. It must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty. Id.; State v. Maurer, supra. If the reviewing court can conclude, based on the entire record, that the prosecutor's improper comments were harmless beyond any reasonable doubt, then the conviction must be affirmed. State v.Zimmerman (1985), 18 Ohio St.3d 43, 45, 479 N.E.2d 862.
 {¶ 74} A closing argument that goes beyond the record may constitute prejudicial error, particularly where the remarks call for the jury to convict in order to meet public demand SeeState v. Dixon (Mar. 13, 1997), Cuyahoga App. No. 68338.
 {¶ 75} In State v. Semenchuk, Cuyahoga App. No. 79523, 2002-Ohio-674, the prosecuting attorney said, "the state is going to ask you to protect her and send a message to the defendant that he cannot get away with this type of behavior regardless of whether or not Ms. Wilson is going to come in and testify truthfully." Viewing the prosecutor's arguments in their entirety, this court determined that the defendant would have been convicted in the absence of the prosecutor's remarks and there was no reason to believe that defendant's substantial rights were materially prejudiced by the prosecutor's remarks.
 {¶ 76} In this matter, we note that there was no objection to the prosecuting attorney's remark that "[w]ould you want [maybe somebody from your family] raised from the floor and thrown * * *." (Tr. 1778). Considering the record as a whole, we cannot conclude that the remark constitutes plain error as we are unconvinced that the remark contributed to the conviction.
 {¶ 77} The second remark advised the jury that "you're here to represent the community and you're here to say if we approve of this conduct" (Tr. 1795). Unless "calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." SeeUnited States v. Solivan, 937 F.2d 1146, 1151 (6th Cir. 1991). A case-by-case analysis is required. Id. In this matter, the remark did not ask the jury to "send a message" as defendant claims, and in our view, there is nothing in this statement that explicitly misinforms the jury of its role. Moreover, the remark did not appear calculated to incite the passions and prejudices of the jurors or to divert the jury from consideration of the evidence at hand to consideration of larger social problems. Accordingly, we are unable to conclude that this comment deprived defendant of a fair trial or that it prejudicially affected his substantial rights.
 {¶ 78} The third assignment of error is without merit.
 {¶ 79} Defendant's fourth assignment of error states:
 {¶ 80} "Officer Talley was denied effective assistance of counsel in violation of the sixth and fourteenth amendments to the United
 {¶ 81} States Constitution and Article I, Section 10 of the Ohio Constitution."
 {¶ 82} Defendant next complains that he was denied effective assistance of counsel when his trial attorney failed to determine the "parameters of the indictment" prior to trial, because, he maintains, the indictment was defective since it did not specify the predicate felony offenses underlying the charges of murder and manslaughter. In order to demonstrate ineffective assistance of counsel, the defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. See Strickland v. Washington (1984),466 U.S. 668, 687, 80 L.Ed.2d 674, 104 S.Ct. 2052; State v. Noling,98 Ohio St.3d 44, 65, 781 N.E.2d 88, 2002-Ohio-7044; State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland v.Washington, supra, 466 U.S. at 687. To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id., 466 U.S. at 687.
 {¶ 83} With regard to the first prong of this test, i.e., whether counsel's performance was deficient, we note that R.C.2941.14 provides:
 {¶ 84} "(A) In an indictment for aggravated murder, murder, or voluntary or involuntary manslaughter, the manner in which, or the means by which the death was caused need not be set forth."
 {¶ 85} In State v. Jones, Cuyahoga App. No. 80737, 2002-Ohio-6045, this court noted that "in the context of involuntary manslaughter, which, as in R.C. 2903.02(B) felony murder, also predicates itself on an underlying offense, the courts have long established that specification of the underlying felony or misdemeanor in an indictment for involuntary manslaughter is not required." This court stated:
 {¶ 86} "The record reflects that Jones' indictment stated that he, on or about August 15, 2001, "unlawfully did cause the death of Warren Culbreath, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, in violation of Section2903.02 of the Revised Code.
 {¶ 87} "Thus, Jones' indictment was stated in the words of the statute, in conformity with Crim.R. 7(B). The lack of particularization of the underlying offense which causes the death is specifically authorized by R.C. 2941.14. Jones does not cite any authority that requires the state to specify the underlying felony in his indictment of murder, and we are aware of none. Applying the case authority regarding involuntary manslaughter, we conclude the state's indictment need not specify the underlying felony. Accordingly, these assignments of error are not well taken."
 {¶ 88} Moreover, the Ohio Supreme Court has held that an indictment is sufficient if it tracks the wording of the applicable statutes, especially when a bill of particulars may be used to obtain additional information. State v. Murphy (1992),65 Ohio St.3d 554, 583, 605 N.E.2d 884.
 {¶ 89} In this instance, the indictment tracked the offenses as defined by statute. In addition, defendant's trial counsel filed a motion for a bill of particulars on November 21, 2002. The bill of particulars was filed on February 28, 2003. Further, the record also reflects that the parties discussed the underlying offenses at a pretrial conference and also at trial. The state indicated that, in order to prove its charge that defendant violated R.C. 2903.02(B), it needed to show that defendant committed the underlying offense of felonious assault (Tr. 1321-1323). In order to prove its charge of involuntary manslaughter in violation of R.C. 2903.04(A), it argued that it needed to demonstrate that defendant caused the death in the commission of a felony, such as felonious assault. (Tr. 1323). In accordance with all of the foregoing, we cannot conclude that defendant's trial counsel was deficient with regard to his discovery of the underlying offenses.
 {¶ 90} The fourth assignment of error is without merit.
 {¶ 91} Defendant's fifth assignment of error states:
 {¶ 92} "The trial court erred when it failed to advise Officer Talley of the length of, and conditions attendant to, the imposition of a term of post-release control."
 {¶ 93} R.C. 2967.28(B) makes post-release control mandatory for first and second degree felonies, felony sex offenses and certain third degree felony offenses involving physical harm to a person. "Pursuant to R.C. 2967.28(B) and (C), a trial court must inform the defendant at sentencing or at the time of a plea hearing that post-release control is part of the defendant's sentence." Woods v. Telb, 89 Ohio St.3d 504, 2000-Ohio-171,733 N.E.2d 1103, paragraph two of the syllabus; see, also, R.C.2943.032 and R.C. 2929.19(B)(3). In State v. Morrisey (Dec. 18, 2000), Cuyahoga App. No. 77179, the trial court had completely failed to inform the defendant of post-release control at either his plea or sentence as required by Woods.
 {¶ 94} In this matter, however, the trial court advised defendant as follows:
 {¶ 95} "Post release control is a common assignment on any homicide conviction. * * * [W]e also know it as parole. The chances are excellent you'll be placed on parole upon your release from prison, a term to be decided by the Ohio Department of Rehabilitation and Control according to their own certain rules.
 {¶ 96} "It's my duty to advise you that you must follow those rules, which basically is reporting, law abiding activity or you face the sentence of half, again. In other words, if you violate your parole you can face a sentence of a year and a half, half your sentence, okay?" (Tr. 2040).
 {¶ 97} In accordance with the foregoing, we conclude that the trial court complied with the law with regard to its imposition of mandatory post-release control. Accord State v. Heckler,
Cuyahoga App. No. 82071, 2003-Ohio-3953.
 {¶ 98} The fifth assignment of error is without merit.
 {¶ 99} Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Rocco, J., Concurs.
 Cooney, J., Concurs in judgment only