JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Curtis Smith, Jr., appeals his murder conviction as being against the manifest weight of the evidence. Appellant also alleges prosecutorial misconduct, ineffective assistance of counsel and error in the trial court's jury instructions.
 {¶ 2} Appellant was indicted by the Cuyahoga County Grand Jury on one count of aggravated murder with a three-year firearm specification and one count of having a weapon while under disability. Appellant waived his right to a jury trial on the having a weapon while under disability charge, and the case proceeded to a jury trial on the aggravated murder charge.
 {¶ 3} At the conclusion of the State's case-in-chief, the defense made a Crim.R. 29 motion for acquittal, which the court overruled. The defense then rested and renewed its Crim.R. 29 motion, which was again overruled.
 {¶ 4} The jury found appellant guilty of murder, a lesser included offense of aggravated murder, and of the attendant three-year firearm specification. The court found appellant guilty of having a weapon while under disability. Appellant was sentenced to a three-year term on the firearm specification, to be served prior and consecutive to a fifteen to life term on the murder charge. Appellant was also sentenced to one year on the having a weapon while under disability charge, which was ordered to be served concurrent with the sentence on the murder conviction.
 {¶ 5} The charges in this case stemmed from the January 15, 2005 fatal shooting of sixteen-year-old Lennard Pinson at the Lonnie Burten Recreation Center in Cleveland. The single fatal gunshot wound to the head was inflicted by a .9 mm bullet and was fired from a distance of more than four feet away. The events leading up to the shooting were recounted at trial by several of the youths who were at the center.
 {¶ 6} On that evening, the youths were gathered at the center for a birthday party for Pinson's girlfriend. Many of the youths were from either the King Kennedy neighborhood or the Garden Valley neighborhood. The two neighborhoods had been in conflict with each other and, in fact, in the two days prior to the shooting, there had been fighting among residents from each of the neighborhoods. During one of the incidents the night before the shooting, appellant, who was from the King Kennedy neighborhood, had an ironing board leg which he threw at a group of youths from the Garden Valley neighborhood. Pinson, who was from the Garden Valley neighborhood, was not present during that altercation, but several of his friends from his neighborhood, who were with him the evening he was shot, were there.
 {¶ 7} The testimony established that shortly after Pinson and other youths from Garden Valley arrived at the center for the party, an altercation ensued inside the center between the warring groups. As a result, an adult chaperone at the party ordered many of the Garden Valley youths, including Pinson and his friends, to leave the center. The Garden Valley youths then congregated outside of the center. One of the youths from the Garden Valley group, Christopher Thornton, had a .25 caliber gun.
 {¶ 8} In the meantime, appellant and Fred Wells, also from the King Kennedy neighborhood, were requested to come to the center. The testimony was conflicting as to whether they were called to the center to fight or to pick up family members. In any event, they arrived at the center as the Garden Valley group was congregating outside. The testimony is again not clear as to whether both appellant and Wells went into the center; some of the witnesses testified that both appellant and Wells went into the center, while Wells and his girlfriend, Serema Wanzo (appellant's former girlfriend), testified that only Wells went into the center and appellant stayed outside. Wells testified he remained in the center and, thus, did not observe the shooting, which occurred outside.
 {¶ 9} Regardless, the testimony revealed that shortly after appellant and Wells arrived at the center, several of the King Kennedy youths came out of the center to where the Garden Valley youths were congregated. The witnesses who testified that they saw appellant go into the center, described that as the King Kennedy youths came running out of the center, appellant came running out last with a gun in his hand and told the King Kennedy group to "get them." At some point, shots were fired somewhere in the general vicinity by an unknown person.[1] At that point, the tension between the Garden Valley group and the King Kennedy group escalated. The testimony did not reveal that any of the youths were injured as a result of that first round of shots.
 {¶ 10} The next shot came from Thornton, Pinson's friend from the Garden Valley group, who, according to the witnesses, save for one, fired the .25 caliber gun in the air one time. Thornton testified that he fired the gun one time in the air in an attempt to clear everybody from the scene.
 {¶ 11} Wells' girlfriend, Serema Wanzo, was the one witness whose testimony conflicted with the other witnesses on this point, however. According to her, Thornton fired four shots as he had the gun pointing out in front of him and was running backward. As Thornton was running backward, Pinson was about five feet in front of him and off to the side. According to Wanzo, Pinson was on the ground after Thornton had finished shooting. Wanzo described, that in reaction to Thornton's shots, appellant said he was going to "clear the place" and shot four shots in the area where the Garden Valley youths were. Wanzo was unable to identify the type of gun appellant had used. Wanzo testified that appellant ran away after he shot the four shots at the Garden Valley youths.
 {¶ 12} Wanzo also claimed that the statement she gave to the police five days after the shooting was not true and that the detective had put words in her mouth. In her statement, Wanzo described the gun appellant used as a .9 mm gun. Wanzo also told the police that Thornton's gun was pointed toward the ground. Moreover, Wanzo told the police that Pinson was on the ground after appellant had finished shooting.
 {¶ 13} Wanzo was also questioned, over the defense's objection, about an unsigned statement and affidavits she had provided to defense counsel subsequent to her statement to the police, wherein she stated that her statement to the police was untrue. In addition to the reasons just mentioned regarding Wanzo's claim of the untruthfulness of her statement to the police, Wanzo claimed in her statement to the defense that approximately two days after the shooting, Jimmy Washington, a boy who used to live in the King Kennedy neighborhood, told her that he shot Pinson. Wanzo testified that her statement to the defense was true, but that due to scheduling conflicts she never met with defense counsel to sign it. Wanzo did not provide a revised statement to the police with the changes in her version of the events.
 {¶ 14} Upon his arrest, and after being Mirandized,
appellant initially told the police that he was at the center when the shooting occurred, but that he had no involvement with the shooting. He stated that his only purpose in going to the center that evening was to pick up his brother and sister. He stated that when he arrived, he observed several of the male youths outside with guns. Appellant stated that he went into the center to get his brother and sister, and as he attempted to exit the center with them the youths began firing at him. Consequently, he sent his brother and sister back into the center and he ran around the center and found a friend who gave him a ride to his girlfriend's house.
 {¶ 15} During that interview, appellant eventually said that he had gotten a ride to the center with Fred Wells, and that before going, he obtained a .9 mm gun from an unknown male. Appellant told the police that as he arrived at the center, a group of the King Kennedy youths came out of the front door of the center in front him and he followed them. Gunfire erupted, so he ran back to the King Kennedy neighborhood, found the male from whom he had borrowed the gun, and returned it to him. Appellant initially denied ever brandishing or firing the gun.
 {¶ 16} Later in the interview, however, appellant told the police that he ran out the center in front of the King Kennedy youths, firing his gun three times into the air. As the statement was being put in written form, appellant stated that he wanted a lawyer and the interview ended.
 {¶ 17} Curtis Smith, Sr., appellant's father, testified that appellant told him that he had a .9 mm gun that evening, but that he fired the gun in the air and did not hit Pinson. Smith explained that appellant told him that he shot the gun in self-defense while running from the center.
 {¶ 18} Wells, appellant's friend who accompanied him to the center that evening, testified that he called appellant approximately one hour after the shooting occurred because he was concerned about the youths saying that appellant was the shooter. Wells testified that upon informing appellant that he had heard he was the shooter, appellant became quiet and did not say anything in response.
 {¶ 19} The physical evidence in this case consisted of the .9 mm bullet removed from Pinson's head and a .25 caliber gun purportedly used by Thornton on the evening in question.[2]
Thornton's gun was excluded by the police as having fired the fatal shot.
 {¶ 20} In his first and second assignments of error, appellant contends that the assistant prosecuting attorney engaged in prosecutorial misconduct in questioning witnesses and during closing argument.
 {¶ 21} Initially, we note that the defense did not object to the questioning and comments that appellant now challenges as being improper. In the absence of objection to either the improper questioning or comments, the alleged prosecutorial misconduct can only be a basis for reversal if it rises to the level of plain error. Crim.R. 52(B); State v. Isaac, Montgomery App. No. 20662, 2005-Ohio-3733, ¶ 24. Where plain error analysis is utilized, the question is whether, absent prosecutorial misconduct, the result of the trial would have clearly been different. State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804; Isaac, supra, at ¶ 24.
 {¶ 22} Appellant claims that improper questioning occurred during the State's questioning of the investigating detectives. Specifically, the assistant prosecuting attorney elicited testimony from the detectives that after appellant was arrested and advised of his Miranda rights, he indicated that he wished to waive those rights and make a statement. After making an oral statement to the detectives, however, appellant indicated that he would not sign a written statement and requested an attorney. Appellant now challenges that testimony as improper comment on appellant's Fifth Amendment right to remain silent.
 {¶ 23} In Doyle v. Ohio (1976), 426 U.S. 610,96 S.Ct. 2240, the Supreme Court of the United States explained that theMiranda warnings convey an implied assurance to the accused that the State will not use a defendant's silence against him at trial. Id. at 618. "Such comments penalize a defendant for choosing to exercise a constitutional right. Prosecutors must therefore take care not to equate the defendant's silence to guilt." State v. Thompson (1987), 33 Ohio St.3d 1, 4,514 N.E.2d 407.
 {¶ 24} If a court finds a Doyle violation, the court must then determine if the error is harmless under the test set forth under Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824. The standard set forth under Chapman requires the State to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" in order for a constitutional error to be ignored as non-prejudicial. Id. at 24.
 {¶ 25} Further, in State v. Williams (1983),6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph six of the syllabus, the Supreme Court of Ohio held that constitutional errors are harmless beyond a reasonable doubt "if the evidence, standing alone, constitutes overwhelming proof of the defendant's guilt." This rule was employed in assessing the prejudicial effect of Doyle errors inState v. Thompson (1987), 33 Ohio St. 3d 1, 514 N.E.2d 407.
 {¶ 26} In this case, appellant was not entirely silent, however. Subsequent to being advised of his Miranda rights, appellant waived his rights and gave an oral statement to the police. Appellant exercised his right to remain silent when the detectives told him that his oral statement was going to be put in writing.
 {¶ 27} In State v. Hankins (Sept. 2, 1993), Cuyahoga App. No. 63360, this court addressed a similar situation. InHankins, the defendant spoke twice to the police after hisMiranda rights were given. In finding no Doyle violation, this court stated:
 {¶ 28} "[Defendant] did not remain silent at the time of his arrest or afterwards and cannot rely on Doyle to prevent the prosecutor from attempting to draw out what he said and did not say. Defendant's refusal to corroborate his statements to [the] police in writing may be commented on at trial." Id. at 11, citing State v. Beasley (June 7, 1993), Cuyahoga App. No. 62852; State v. Lucaj (May 17, 1990), Cuyahoga App. No. 56933.
 {¶ 29} Thus, under the circumstances of this case, it was not improper for the assistant prosecuting attorney to question the detectives about appellant's oral statement and the reason for the lack of a written statement memorializing his oral statement.
 {¶ 30} Appellant also challenges comments made by the assistant prosecuting attorney in closing argument. As an initial matter, we note that some latitude is granted to both parties in closing argument. State v. Jackson (1991), 57 Ohio St.3d 29,40, 565 N.E.2d 549.
 {¶ 31} Appellant first argues that the assistant prosecuting attorney's reference in closing argument to appellant's exercise of his right to remain silent was improper. A review of closing arguments demonstrates that the reference was not improper, however. Specifically, the assistant prosecuting attorney never mentioned appellant's exercise of his right to remain silent in his initial closing argument. In closing argument for the defense however, appellant's counsel, in arguing about the quality of the police's investigation in this case, attacked the fact that appellant's statement was not recorded in any fashion. Thus, in his rebuttal closing argument, the assistant prosecuting attorney responded to defense counsel's arguments on this point as follows:
 {¶ 32} "Let's put the police on trial and challenge what they have reported as far as the Defendant's own conduct and what his words were concerning this event. Evaluate the testimony of [Detective] Ververka, evaluate State's Exhibit No. 31 as far as what the Defendant said, and ask yourself in the context of what has occurred through the course of this investigation how it fits in."
 {¶ 33} Under the circumstances of this case, the assistant prosecuting attorney's argument was not an improper comment on appellant's exercise of his right to remain silent.
 {¶ 34} Appellant also challenges comments made by the assistant prosecuting attorney that he characterizes as "designed to appeal to the passions of the jury." It is established that a prosecutor may not call for the jury to convict based on public demand. State v. Hicks (1989), 43 Ohio St.3d 72, 76,538 N.E.2d 1030. Moreover, a prosecuting attorney may not urge the jury to convict for reasons wholly irrelevant to the guilt or innocence of the accused. See State v. Tyler (1990), 50 Ohio St.3d 24,40, 553 N.E.2d 576.
 {¶ 35} The comments appellant now complains of were essentially urging the jury to consider the type of message it would be sending to the community if they rejected the youths' testimony: to wit, that they could not be believed because they were from the inner city of Cleveland.
 {¶ 36} Upon review, we do not find the comments were improper. We note the latitude that is afforded to both sides in closing argument. Jackson, supra. Moreover, in instructing the jury, the court admonished the jury as follows:
 {¶ 37} "It also follows that, in strict keeping with your oath, you refuse absolutely to be moved, swayed or influenced by consideration such as sympathy for or bias or prejudice against either the State of Ohio or the Defendant in this case."
 {¶ 38} "A jury is presumed to follow the instructions, including curative instruction, given it by a judge." State v.Garner (1995), 74 Ohio St.3d 49, at 59, 656 N.E.2d 623.
 {¶ 39} Accordingly, in light of the whole record, we do not see such prejudice to the appellant as to affect his substantial rights and, therefore, find no reversible error.
 {¶ 40} Appellant next challenges comments made by the assistant prosecuting attorney in closing argument that appellant contends characterized him as a gang leader/street fighter. A review of the closing arguments reveals that, in his initial closing argument, the assistant prosecuting attorney made references to "mob activity" on the evening of the shooting, without any specific references to appellant in that regard. Read in context, the assistant prosecuting attorney was referring to the fact that mobs of youth were congregated outside the center at the time of the shooting and upon the arrival of the police at the scene.
 {¶ 41} Again, it was defense counsel in his closing argument who referenced appellant allegedly being a gang member/street fighter: "[The] State of Ohio tried to make the Defendant out to be a bad guy. He's the leader of KKO. Tough guy. Enforcer. The big man.
Everybody knows this and [is] afraid of this guy."
 {¶ 42} Even in his rebuttal closing argument, the assistant prosecuting attorney did not, in response to defense counsel's closing argument, refer to appellant as a gang member/street fighter. Thus, there was no improper comment by the assistant prosecuting attorney in closing argument about appellant being a gang member/street fighter.[3]
 {¶ 43} Finally, in regard to closing arguments, appellant contends that the assistant prosecuting attorney improperly attacked defense counsel's honesty. Appellant cites the following comments in support of his argument:
 {¶ 44} "Now, good lawyering through the course of the case. Let's put the Cleveland Police Department on trial.
 {¶ 45} "* * *
 {¶ 46} "What I'm suggesting to you, ladies and gentlemen, is you have to look beyond the smoke screens, look beyond the red herrings and look to the Defendant's conduct * * *.
 {¶ 47} "* * *
 {¶ 48} "Then ask yourself, and maybe Mr. Sims [defense counsel] can give you an explanation, why do we have prepared affidavits for Serema? Serema, perhaps you would like to select Affidavit No. 1 as far as what transpired, or maybe Affidavit No. 2? How do you resolve that? And, first of all, ask yourself, why would you be preparing affidavits for her signature when she's made a statement, she's testified that for the most part it's true. * * * Ladies and gentleman, this is what we call a red herring. It's designed to distract you from the obvious, that your obligation is to decide the case against the Defendant * * *.
 {¶ 49} "Ladies and gentleman, besides all of the smoke screens and all of these distractions as far as what transpired on that particular evening, you're stuck with what the Defendant told to [Detective] Veverka, what the Defendant told his dad, what the Defendant did not say to his friend who he arrived with, Fred Wells
* * *."
 {¶ 50} Lastly, appellant cites to the following argument made by the assistant prosecuting attorney in his rebuttal closing argument:
 {¶ 51} "I challenge you — ladies and gentlemen, this is another red herring on the part of the defense in this case to distract you and take your attention away from the Defendant's responsibilities for his activities that night.
 {¶ 52} "[Appellant's] own father — Mr. Sims didn't discuss this — his own father came in here and testified to you, ladies and gentlemen, that he had a conversation with his son concerning what happened that night."
 {¶ 53} We again note the latitude afforded to counsel in closing argument. Johnson, supra. We do not find that the above-quoted comments exceed the latitude given in closing argument.
 {¶ 54} Finding no prosecutorial misconduct, we overrule appellant's first and second assignments of error.
 {¶ 55} In his third assignment of error, appellant contends that he was denied effective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052.Strickland requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687-696. In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. Id.; State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 56} Appellant's claim of ineffective assistance of counsel is based upon his counsel's failure to object to the alleged improper questioning and comments by the assistant prosecuting attorney, as set forth in the first and second assignments of error. We disagree with appellant's claim.
 {¶ 57} The failure to make objections alone is not enough to sustain a claim of ineffective assistance of counsel. State v.Holloway (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831; Statev. Gumm, 73 Ohio St.3d 413, 428, 1995-Ohio-24, 653 N.E.2d 253. Thus, to prevail on a claim of ineffective assistance of counsel, appellant must meet the two-pronged Strickland test, and show both that there was a substantial violation of counsel's duties and that he was materially prejudiced by counsel's ineffectiveness. Holloway, supra, at 244. For the reasons already discussed in addressing the first and second assignments of error, there was no substantial violation of defense counsel's duties to appellant.
 {¶ 58} Thus, appellant has failed to demonstrate that he received ineffective assistance of counsel and his third assignment of error is overruled.
 {¶ 59} In his fourth assignment of error, appellant contends that the trial court erred in instructing the jury on complicity because complicity was not charged in the indictment and there was no factual basis for the instruction.
 {¶ 60} We review jury instructions under an abuse of discretion standard. State v. Chinn, 85 Ohio St.3d 548,1999-Ohio-288, 709 N.E.2d 1166. An abuse of discretion connotes more than an error of law or judgment; it implies an attitude on the part of the court that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 61} It is well established that jury instructions must be reviewed as a whole. State v. Burchfield, 66 Ohio St.3d 261,1993-Ohio-44, 611 N.E.2d 819. A trial court must give jury instructions that provide a correct, clear and complete statement of the law. Bryant v. Walt Sweeney Automotive, Inc., Hamilton App. Nos. C-010395 and C-010404, 2002-Ohio-2577.
 {¶ 62} Here, over defense counsel's objection, the trial court instructed the jury on complicity. The defense argued that the instruction was improper, as complicity had not been charged by the Grand Jury in the indictment and the bill of particulars made no mention of complicity. Appellant argues that the defense was "blindsided" by the instruction and that the instruction, in effect, constituted, a "significant alteration of the charges."
 {¶ 63} R.C. 2923.03(F), governing complicity, provides in relevant part that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 64} In addressing a similar argument that the trial court amended the indictment by instructing the jury on complicity in a case where complicity had not been charged in the indictment, this court stated that:
 {¶ 65} "Pursuant to R.C. 2923.03(F), a charge of complicity may be stated in terms of R.C. 2923.03 or in terms of the principal offense. State v. Caldwell (1984),19 Ohio App.3d 104, 483 N.E.2d 187. Where one is charged in terms of the principal offense, he or she is on notice, by operation of R.C.2923.03(F), that evidence could be presented that the defendant was either a principal or an aider and abettor for that offense. See State v. Dotson (1987), 35 Ohio App.3d 135, 520 N.E.2d 240. Because a charge of complicity may be stated in terms of either the principal offense or in terms of R.C. 2923.03, the complicity section, the indictment was not amended when the court instructed the jury that they could find Johnson guilty under the complicity theory." State v. Johnson, Cuyahoga App. Nos. 81692 81963, 2003-Ohio-3241.
 {¶ 66} Accordingly, R.C. 2923.03(F) permits a complicity instruction in instances where a defendant has been indicted as a principal offender. Such an instruction would only be proper, however, if there were sufficient evidence in the record to establish complicity. State v. Woods (1988), 48 Ohio App.3d 1,548 N.E.2d 954.
 {¶ 67} R.C. 2923.03(A)(3), governing complicity, provides that "[n]o person, acting with the kind of culpability for the commission of an offense, shall do any of the following: * * * [a]id or abet another in committing the offense."
 {¶ 68} In this case, there was testimony that appellant and Wells were summoned to the center to "handle" the escalating situation between the Garden Valley youths and the King Kennedy youths, and that on their way to the center they stopped so that appellant could obtain a .9 mm gun. Upon arriving at the center, appellant brandished the gun and encouraged the King Kennedy youths to fight.
 {¶ 69} Thus, there was sufficient evidence in the record to warrant a complicity instruction based upon the State's aiding and abetting theory. Appellant's fourth assignment of error is overruled.
 {¶ 70} In his fifth and final assignment of error, appellant contends that his conviction was against the manifest weight of the evidence. A challenge to the weight of the evidence attacks the credibility of the evidence presented. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. When evaluating a claim that a conviction was contrary to the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.; Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction." Martin, supra.
 {¶ 71} In challenging the weight of the evidence, appellant essentially attacks the credibility of the State's witnesses, the lack of physical evidence linking him to the shooting, and the quality of the police investigation.
 {¶ 72} Upon review, we find that the conviction was not against the manifest weight of the evidence. The evidence demonstrated that appellant arrived at the center, with a .9 mm weapon, as the confrontation among the youths was escalating, and shot it in the direction of the Garden Valley youth, among whom was Pinson. Pinson died as a result of .9 mm bullet shot wound to the head. Further, there was credible evidence that appellant went to the center to "handle" the confrontation that had ensued between the Garden Valley youths and the King Kennedy youths, and that upon his arrival at the center, he encouraged violence between the youths. Thus, the weight of the evidence supported the conviction.
 {¶ 73} Appellant's fifth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J., and Blackmon, J., concur.
[1] Because of the conflicts in the testimony previously mentioned, there are varying accounts of exactly when these shots were fired. There was testimony indicating that they were fired just moments after appellant and Wells arrived at the center, and there was testimony that the shots were fired when appellant exited the center with the King Kennedy youths. Moreover, there was conflicting testimony as to the number of shots fired (ranging from between three to nine shots)and where the shots came from (ranging from as close as the playground adjacent to the center to several blocks away).
[2] Approximately two weeks after the shooting, Thornton turned a.25 caliber gun over to the police.
[3] Appellant also argues within this assignment of error that the assistant prosecuting attorney improperly questioned his witnesses about their and/or appellant's gang involvement. The record does reveal such questioning, without the defense's objection. (The record also reveals that the assistant prosecuting attorney referenced gang activity in his opening statement. Appellant has not raised and/or argued any impropriety in regard to opening statement, however). Under Evid.R. 404(B), a defendant's gang membership is inadmissible to prove that he or she had a propensity to commit crime. State v. Robb (2000),88 Ohio St.3d 59, 69, 723 N.E.2d 1019. Background information, however, is admissible to give the jury the setting of the case.State v. Hurt (Mar. 29, 1996), Franklin App. No. 95APA06-786, citing State v. Wilkinson (1980), 64 Ohio St.2d 308, 317,415 N.E.2d 261. All of the witnesses denied that they were in a gang originating from their respective neighborhoods, or even that such gangs existed. Nonetheless, the references to gang membership in this case were background information, necessary to give the jury the setting of the case, and were permissible as an attempt to demonstrate motive, as allowed by Evid.R. 404(B).