{¶ 1} Defendant-appellant Kevin Ferko ("Ferko") appeals from his conviction and sentence. Ferko argues his due process rights were violated, his conviction is against the manifest weight of the evidence, his trial counsel rendered ineffective assistance, and his imposed sentence is contrary to law. For the following reasons, we affirm Ferko's conviction and sentence.
 {¶ 2} This case arose out of events that occurred on August 5, 2005 and August 6, 2005, during which Matthew Liebsla ("Liebsla") died from injuries sustained while attending a party at Dustin Enklat's house.
 {¶ 3} On August 5, 2005, Dustin Enklat threw a going-away party for Mary Kravuchuck at his home at 28541 Alden Drive in North Olmsted, Ohio. Although *Page 3 
Dustin Enklat anticipated around twenty people, by midnight, the party swelled to between thirty and fifty people. The crowd ranged in age from eighteen to twenty-two years old. There was heavy drinking at the party, and several individuals were smoking marijuana. Rachelle Greene, a friend of Mary Kravuchuch, called her brother, Luke Greene, and invited him, along with Ferko, Jimmy Stewart, and John Ferko, Kevin Ferko's brother, to the party. Luke Greene, Ferko, John Ferko and Jimmy Stewart arrived around midnight and observed that people were "drunk and being wild."
 {¶ 4} At approximately 1:00 a.m., Ferko began arguing with his girlfriend, Priscilla Greene, inside Dustin Enklat's house. Dustin Enklat heard them yelling and told Ferko and Priscilla Greene to leave the party. Dustin Enklat and Ferko exchanged profanities and Ferko, along with Priscilla and Rachelle Greene, exited through the back door of the house. As they were leaving, Ferko, Priscilla and Rachelle Greene met up with John Ferko and another friend of theirs, Frank Lozano, who also attended the party.
 {¶ 5} The group walked around the back of the house on the sidewalk towards the front of the house. Dustin Enklat and his friends, Adam and Ryan Snyder and Dustin Phillips escorted the group to the front to make sure they were leaving the property. As the groups walked to the front of the house, they exchanged harsh words. *Page 4 
 {¶ 6} When both groups reached the front of the house, the scene at the party got worse, with people screaming, yelling, cursing at each other and looking for a fight. At this point in time, most of the people at the party were now in the front yard of Dustin Enklat's house. Several witnesses described the scene as chaotic and as happening very quickly.
 {¶ 7} It is at this point, that the State of Ohio ("State") and defense counsel disagree as to what occurred. The State contends that as Ferko walked to the front yard, he removed his shirt and punched and kicked Liebsla in the head. Liebsla attended the party that night and just happened to be in the front yard. The State elicited testimony from Dustin Enklat, who stated that when he was twenty to twenty-five feet away from Liebsla, he observed Ferko hit Liebsla. The witness testified that although Ferko had been wearing a red t-shirt earlier that night, at the time he hit Liebsla, he had removed the shirt. Dustin Enklat also testified that two streetlights, a garage light and landscaping lights allowed him to see Ferko strike Liebsla.
 {¶ 8} Dustin Enklat approached Liebsla and saw blood coming out of Liebsla's nose and mouth. Dustin Enklat leaned down to check on his friend and when he stood up, Ferko punched him in the face. Dustin identified Ferko as the individual who hit him and Liebsla. Dustin Enklat also testified that Ferko and his brother, John, looked a lot alike and that John wore a red Cincinnati sweatshirt to the party. *Page 5 
 {¶ 9} The State supported their position that Ferko struck Liebsla with the testimony of six witnesses that attended the August 5, 2005 party: Dustin Enklat, Stephen Kral, Adam Snyder, Dan Olesick, Dustin Phillips, and Amanda Ohneth. These witnesses claim Ferko struck and kicked Liebsla and then jumped into the back of a white pick-up truck and continued to taunt the partygoers as the truck drove away.
 {¶ 10} However, at the time these witnesses claimed Ferko struck Liebsla, several fights had broken out in the front yard between two groups of people who had only met that night. Additionally, the partygoers admitted that the yard was not well lit, making it hard to see who was fighting whom. Moreover, many of the witnesses had been drinking heavily and/or smoking marijuana during the hours proceeding the fight. The presence of these variables gives rise to Kevin Ferko's version of the events.
 {¶ 11} Ferko and his counsel argue that after Dustin Enklat told him and his friends to leave the party, they began to circle Ferko. Ferko's counsel argued that things became heated between the two groups of people. When the fights erupted in the front yard, Jimmy Stewart came out of nowhere, took off his shirt, and hit three people, one after another, knocking each of them out. Ferko's attorney supported this position with the testimony of Rachelle Greene, Frank Lozano and Stephanie Farmer. All three testified that they observed Jimmy Stewart hit three people, *Page 6 
knocking each of them out. While Ferko's attorney conceded that Ferko was involved in a fight during the party, Ferko's counsel claimed his client struck Dustin Enklat, not Liebsla.
 {¶ 12} At approximately 1:06 a.m., the North Olmsted police received a call to respond to a fight in progress at Alden Drive. When the police arrived, they discovered Liebsla lying in the front yard near the large pine tree, with his face "covered with blood" and "a pool of blood in his mouth." Paramedics noted that Liebsla needed assistance to breathe and transported the patient to a nearby hospital.
 {¶ 13} The North Olmsted police were also informed that three males and a female had fled in a white pick-up truck with license plate number DLD616A and advised other officers to look for such a vehicle. A Westlake police officer observed a vehicle matching that description and detained its occupants: Luke Greene (driver), Stephanie Farmer (passenger) and John Ferko (passenger).
 {¶ 14} The North Olmsted police officers arrived and transported the occupants of the truck back to the scene of the fight to participate in a cold stand identification. The police officers removed the individuals from the police cars one at a time, and kept them in the street at the edge of the driveway where the officers shined spotlights on them. The officers instructed the witnesses to stand halfway up the driveway. When the police removed John Ferko from the police car, three *Page 7 
witnesses, Dustin Enklat, Stephen Kral, and Adam Snyder identified him as the individual who hit Leiblsa. These three witnesses later asserted that they were mistaken, and, after observing a photo lineup containing pictures of Ferko and his brother, John Ferko, they identified Ferko as the individual who struck Liebsla.
 {¶ 15} On August 6, 2006, at 11:00 a.m., Lieblsa was pronounced dead. Liebsla died from bleeding on the surface of the brain caused by a tiny laceration to the basilar artery. The tearing of the basilar artery was the result of
 "[A] whiplash type injury where the head rapidly goes backwards quickly and with it going back quickly, the artery just tears at its weakest point and the blood starts to leak into areas that there should not be blood." (Testimony of Deputy Coroner during trial)
 {¶ 16} The deputy coroner explained that this type of injury was likely caused by "moderate force" and is indicative of the victim being surprised. He further testified that Liebsla had three contusions on his face that were likely the result of being struck three separate times with a blunt object. In his opinion, the three injuries to Liebsla's head were probably the result of punches and that any of the three impact sites could have been the cause of the whiplash force. The deputy coroner testified that death from this type of external injuries was not common.
 {¶ 17} On August 6, 2006, the police officers attempted to interview as many partygoers as possible in an attempt to ascertain who struck Liebsla. From the descriptions given by the partygoers, the police ascertained it was one of the Ferko brothers that hit Liebsla. The police then interviewed John Ferko, who was in *Page 8 
custody from the night before, to ascertain his version of the events. The police officers informed John Ferko that several witnesses had identified him as the person who struck Liebsla. John Ferko denied that he struck Liebsla and told officers that other people were fighting that night. The officers then acquired Ferko's contact information, and Ferko later responded to the North Olmsted Police Department in response to a request for questioning.
 {¶ 18} While the officers and Ferko were exchanging pleasantries, Ferko stated "Is this about the fight last night." The officer asked Ferko to repeat the statement and Ferko responded as follows: "Is this about the fight last night? This is about me punching and kicking that boy?" The officers informed Ferko that the boy he punched and kicked passed away. Ferko immediately responded as follows: "Well, it wasn't that boy. The boy I punched is in the lobby of the police station." The officers informed Ferko of his Miranda rights, which Ferko waived. Ferko then handwrote a statement wherein he denied hitting Liebsla and admitted hitting Enklat. After the officers completed the interrogation, they processed, photographed, and placed Ferko in a jail cell.
 {¶ 19} On August 15, 2005, a Cuyahoga County Grand Jury returned a two-count indictment charging Ferko with murder and felonious assault. Ferko pleaded not guilty and elected to try his case to a jury. After numerous pretrial hearings and several continuances, Ferko's jury trial began on March 13, 2006. *Page 9 
 {¶ 20} During trial, both parties presented substantial amounts of evidence to support their version of the events. The State put forth its argument that Ferko punched and kicked Leibsla, causing the injuries that resulted in his death. In response, Ferko's attorney argued Stewart landed the punches that caused Leibsla's death. Additionally, Ferko's attorney cross-examined the State's witnesses concerning the lighting, distance, intoxication, and inconsistent statements or memories.
 {¶ 21} At the close of the evidence, the trial instructed the jury on the indicted offenses of murder and felonious assault, as well as the lesser-included offenses of involuntary manslaughter and assault. Upon full deliberation, the jury found Ferko not guilty of murder and felonious assault but guilty of involuntary manslaughter and misdemeanor assault. On April 12, 2006, the trial court sentenced Ferko to a five-year term of imprisonment. Ferko appeals, raising the five assignments of error contained in the appendix to this opinion.
 {¶ 22} In his first assignment of error, Ferko argues the prosecutor committed misconduct thereby depriving him of his due process right to a fair trial. Ferko claims the prosecutor committed misconduct during closing argument by "urging the jury to consider facts not in evidence, commenting on the credibility of witnesses, urging the jury to draw improper inferences and rely on improper considerations." For the reasons explained below, Ferko's arguments are without merit. *Page 10 
 {¶ 23} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 2000-Ohio-187.
 "Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. In closing argument, a prosecutor may comment freely on `what the evidence had shown and what reasonable inferences may be drawn therefrom.' `Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the Defendant has been prejudiced.'" (Citations omitted.)
State v. Justice, Montgomery App. No. 21375, 2006-Ohio-5965.
 {¶ 24} Initially, we note that in nearly all of his claims of error regarding prosecutorial misconduct, Ferko did not object to the comments he now challenges as being improper. In the absence of objection to either the improper comments, the alleged prosecutorial misconduct can only be a basis for reversal if it rises to the level of plain error. Crim.R. 52(B). Where the plain error analysis is used, the question is whether, absent prosecutorial misconduct, the result of the trial would have clearly been different. State v. Smith, Cuyahoga App. No. 86690,2006-Ohio-3156.
 {¶ 25} Ferko challenges comments made by the assistant prosecuting attorney that he characterizes as "telling the jury to consider public opinion in rendering its verdict." It is established that a prosecutor may not call for the jury to convict based on public demand. State v.Hicks (1989), 43 Ohio St.3d 72. The comments Ferko *Page 11 
now complains of were essentially urging the jury to consider the seven eyewitnesses' testimony.
 {¶ 26} Upon review, we find the comments do not require a mistrial. We note the latitude that is afforded both sides in closing argument.Smith, supra. Additionally, in instructing the jury, the court admonished the jury as follows:
 "You must not be influenced by any consideration of sympathy or prejudice."
 {¶ 27} "A jury is presumed to follow the instructions * * * given it by a judge." State v. Garner, 74 Ohio St.3d 49, 1995-Ohio-168.
 {¶ 28} Accordingly, in light of the whole record, we do not see such prejudice to the appellant as to affect his substantial rights, and therefore, find no reversible error.
 {¶ 29} Ferko next challenges comments made by the assistant prosecuting attorney in closing argument that Ferko contends vouched for the credibility of the State's witnesses. We do not agree with Ferko's characterization of the prosecutor's statements. In his closing argument, the assistant county prosecutor told the jury that no one else would be charged with the crimes of murder and felonious assault. The assistant prosecuting attorney supported this statement with reference to the seven eyewitnesses who testified in court that Ferko hit Liebsla.
 {¶ 30} We do not see how these comments made by the assistant county prosecutor vouched for the credibility of any witness. He merely commented freely *Page 12 
on "what the evidence has shown and what reasonable inferences may be drawn therefrom." Justice, supra. Accordingly, we do not find that the assistant county prosecutor vouched for the credibility of any witness.
 {¶ 31} Ferko also claims the assistant county prosecutor "improperly commented on the credibility of defense witness John Ferko and wrongly suggested that defense witnesses had fabricated their testimony." Ferko cites to the following comments in support of his argument:
 "John Ferko clearly, in the chain of events, clearly leads one to believe-irrespective of what you find John Ferko had told detectives, do you really believe that they coerced him into not putting in that Jimmy Stewart hit three people? Two detectives with the type of experience and years that they have under their belt? Come on. That's a fabrication.
 * * *
 "If Liebsla is one, Enklat is the second, who is the third and fourth? How did we miss those guys?
 * * *
 "Because they are phantom. They don't exist. It's a fabrication by the defense witnesses. Make no mistake about it. Blaming Jimmy Stewart is like cutting from the herd. It's throwing him under the bus because he's the odd man out. The Ferkos and Greenes have known each other for years. They all admitted that they hadn't seen Jimmy in a while, hadn't talked to him."
 {¶ 32} During trial, John Ferko testified he told the police officers Stewart punched three people, but the officers coerced him from saying so in his written statement. The State called one of the officers as a rebuttal witness, who testified *Page 13 
that John Ferko never told him Jimmy Stewart hit three people during the fight. Additionally, in the statements taken by Rachelle and Priscilla Greene and Stephanie Farmer, neither party mentions Jimmy Stewart striking three people.
 {¶ 33} After reviewing this evidence, we find that during his closing statement, the prosecutor merely commented on the credibility of witnesses based on their in-court testimony. State v. Carpenter (1996),116 Ohio App.3d 615. We again note the latitude afforded to counsel in closing argument and find no error with the assistant county prosecutor's comments. Justice, supra.
 {¶ 34} Finally, Ferko claims the assistant county prosecutor distorted facts and argued matters outside of the record. After reviewing the statements cited by Ferko and noting the latitude afforded to counsel in closing arguments, we do not see such prejudice to Ferko as to affect his substantial rights. Therefore, we do not find reversible error.
 {¶ 35} Based on the above, we overrule Ferko's first assignment of error.
 {¶ 36} In his second assignment of error, Ferko argues his convictions for involuntary manslaughter and assault are against the manifest weight of the evidence. In particular, Ferko argues that the eyewitness identification testimony is, in light of the evidence produced at trial, not credible and does not support his conviction. We disagree with Ferko. *Page 14 
 {¶ 37} When an appellate court reviews a claim that a conviction is against the manifest weight of the evidence, this court must dutifully examine the entire record, weigh the evidence and consider the credibility of the witnesses. State v. Trego, Ross App. No. 04CA2763,2004-Ohio-5396. Additionally, this court must bear in mind that credibility is generally an issue for the trier of fact to resolve. Id.;State v. Issa, 93 Ohio St.3d 49, 2001-Ohio-1290.
 "It is fundamental that the trier of fact is to determine the weight given the evidence and the credibility given to the testimony of witnesses. Accordingly, the trier of fact may believe all, part, or none of the testimony of each witness who appears before it. We also acknowledge that a trier of fact is much better situated than an appellate court to view the witnesses and observe their demeanor, their gestures and their voice inflections, and to use those observations to weigh the credibility of their testimony. Thus, reviewing courts should generally defer to the trier of fact on matters of evidentiary weight and witness credibility. (Citations omitted).
 "Once a reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the factfinder, in resolving conflicts in evidence, `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. A reviewing court should find a conviction against the manifest weight of the evidence only in the `exceptional case in which the evidence weighs heavily against conviction.'" (Citations omitted).
Trego, supra. *Page 15 
 {¶ 38} In the present case, Ferko asserts that the sole issue is the identity of the person who punched Liebsla. During its case in chief, the State supplied six witnesses who identified Ferko as the assailant: Dustin Enklat, Stephan Kral, Adam Snyder, Dustin Phillips, Amanda Ohneth, and Dan Olesick. Ferko notes that the individuals who identified him as the assailant had never met him before, only saw him at night, some witnesses had previously identified his brother as the assailant, and several of the witnesses had been drinking heavily or smoking marijuana in the hours before the fight.
 {¶ 39} Consequently, Ferko argues that Rachelle Greene, Frank Lozano, Stephanie Farmer and John Ferko all knew him well and observed Jimmy Stewart hit at least three separate people, knocking them out.
 {¶ 40} Courts have long recognized the danger associated with unreliable eyewitness identification and the fact that misidentification can, and does, occur. Trego, supra.
 "Consequently, we must examine the facts that surround eyewitness identification to determine whether the witness had the capacity and an adequate opportunity to observe an offender, including the amount of time available for observation, distance, lighting conditions, previous contact, and whether subsequent identification procedures may have influenced the eyewitness identification. We further note that with respect to out-of-court identification evidence, testimony is properly admitted unless the identification procedure was so impermissibly suggestive that a substantial likelihood if irreparable misidentification exists." (Citations omitted).
Trego, supra. *Page 16 
 {¶ 41} In the case at bar, our review of the record reveals that the State's witnesses, especially Dustin Enklat, had ample opportunity to view Ferko. Unlike a passive encounter, Dustin Enklat had a high degree of attention directed to Ferko at the time of his observation. Dustin Enklat followed Ferko from the back of the house towards the front, all in an effort to make sure Ferko left the party. It was at this point that Dustin Enklat observed Ferko punch Liebsla in the head.
 {¶ 42} Although Dustin Enklat, Stephan Kral, and Adam Snyder originally identified John Ferko at the cold stand identification as the individual who hit Liebsla, these three witnesses observed John Ferko with minimal light from a great distance away. Additionally, evidence revealed that both John Ferko and Kevin Ferko wore red shirts to the party, and, at the time of the cold stand, John Ferko was wearing a red shirt. Moreover, Dustin Enklat, Stephen Kral, Dustin Phillips, Dan Olesick, and Adam Snyder all identified Ferko as the assailant from a photo lineup that included both Ferko and John Ferko's pictures.
 {¶ 43} We note that Ferko's counsel pointed out to the jury possible discrepancies and questions in an attempt to convince the jury to attach little or no weight to the State's witnesses' testimony. And, although Ferko argues his version of the events should have been relied upon by the factfinder, the trier of fact is in the best position to weigh the evidence and the credibility of witnesses. Trego, supra. As the reviewing court, we find that the State's case provides substantial evidence *Page 17 
upon which the trier of fact could reasonably conclude, beyond a reasonable doubt, that each element of the involuntary manslaughter and assault offenses had been established. Accordingly, we cannot state that the trier of fact lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.
 {¶ 44} Therefore, based on the forgoing reasons, we overrule Ferko's second assignment of error.
 {¶ 45} In his third assignment of error, Ferko argues his trial counsel rendered ineffective assistance. Specifically, Ferko claims his trial counsel was ineffective for failing to call an expert in the field of eyewitness identifications. This assignment of error lacks merit.
 {¶ 46} In order to prevail on a claim for ineffective assistance of counsel, the defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052; State v.Bradley (1989), 42 Ohio St.3d 136. Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment." Strickland, at 687. To establish prejudice, "the defendant must prove that there exists a reasonable *Page 18 
probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, at 143.
 {¶ 47} In determining whether counsel's performance fell below an objective standard of reasonableness, "judicial scrutiny of counsel's performance must be highly deferential." Strickland, at 689. Because of the difficulties inherent in determining whether counsel rendered effective assistance in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 48} In the present case, Ferko has not shown either of the elements to prevail on a claim of ineffective assistance of counsel. Ferko claims that because his conviction was "based solely on six unreliable eyewitness identifications * * * his counsel was constitutionally deficient in failing to present expert testimony to support his defense that he was misidentified." However, in our second assignment of error, we specifically found that the State provided substantial evidence upon which the trier of fact could reasonably conclude, beyond a reasonable doubt, that each element of the involuntary manslaughter and assault offenses had been established. As such, there is no reasonable probability the outcome of trial would have been different if Ferko's counsel had provided the suggested expert testimony.
 {¶ 49} Moreover, if Ferko's counsel did provide expert testimony concerning the unreliability of eyewitness identification, it would have undermined Ferko's theory *Page 19 
of the case. Ferko's attorney consistently argued the State's witnesses' identifications were wrong, while Rachelle Greene, Frank Lozano, Stephanie Farmer and John Ferko's identifications of Jimmy Stewart as the assailant were correct. Any expert testimony about the unreliability of eyewitness identification would have undermined this argument.
 {¶ 50} Based on the above, we find Ferko has not established either element to support a claim of ineffective assistance of counsel.Strickland, supra; Bradley, supra. We therefore, overrule Ferko's third assignment of error.
 {¶ 51} In his fourth assignment of error, Ferko argues the trial court misapplied R.C. 2929.11, governing the purposes of felony sentencing. This assignment of error lacks merit.
 {¶ 52} "A sentence imposed for a felony shall be * * * consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). Although a trial court is required to engage in the analysis set forth by R.C. 2929.11(B) to ensure the consistency of sentences, a court is not required to make specific findings on the record in this regard. State v. Green, Astabula App. Nos. 2005-A-0069 and 2005-A-0070, 2006-Ohio-6695. In State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, the Ohio Supreme Court characterized R.C. 2929.11(B), like R.C. 2929.12(A), as a "general guidance statute," under which "there is no mandate for judicial factfinding." Foster, supra. *Page 20 
 {¶ 53} Ferko cites to two cases where offenders received lesser sentences than his for "similar or worse cases." State v. Talley, Cuyahoga App. No. 83237, 2004-Ohio-2846 (three years for a first degree felony) and State v. Dubose, Cuyahoga App. No. 85394, 2005-Ohio-3844. (three years for a third degree felony).
 {¶ 54} However, the State correctly points out that the cases cited by Ferko are factually distinguishable and are therefore not "similar or worse cases." Thus, there is nothing unprecedented about Ferko's sentence. Accordingly, Ferko's fourth assignment of error is overruled.
 {¶ 55} In his fifth and final assignment of error, Ferko argues that his sentence is contrary to law. In particular, Ferko argues the Ohio Supreme Court's decision in Foster, supra, should not apply to his case because his alleged crimes occurred prior to the Foster decision. Ferko also claims his due process rights were violated with an ex post facto application of Foster because the alleged crimes occurred beforeFoster was released.
 {¶ 56} This court recently addressed these identical issues and determined the following:
 "Foster addresses the constitutionality of sentences imposed pursuant to Am. Sub. S.B. No. 2, effective July 1, 1996. S.B. 2 is applicable to all offenses committed on or after that date. Additionally, because Foster applies to all cases on direct review, Fosfer applies to the instant case." (Citations omitted.)
State v. Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715. *Page 21 
 {¶ 57} This court then went on to address whether Foster violates the ex post facto clause. After a thorough analysis of state and federal law, this court found as follows:
 "In the instant case, Mallette had notice that the sentencing range was the same at the time he committed the offenses as when he was sentenced. Foster did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none existed. As a result, we conclude that the remedial holding of Foster does not violate Mallette's due process rights or the ex post facto principles contained therein."
Mallette, supra.
 {¶ 58} Because we find the holding of Mallette directly applies to the instant matter, we adopt the Mallette court's holding. We therefore find that the remedial holding of Foster does not violate Ferko's due process rights or the ex post facto principles contained therein.
 {¶ 59} Ferko's fifth and final assignment of error is overruled.
 {¶ 60} The judgment of the trial court is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. *Page 22 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J. and ANTHONY O. CALABRESE, JR., J. CONCUR
Appendix A
 Assignments of Error:
 "I. Appellant was denied his due process right to a fair trial as a result of prosecutorial misconduct.
 II. Appellant's convictions of involuntary manslaughter and assault are against the manifest weight of the evidence.
 III. Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when his counsel failed to offer expert testimony on eyewitness identification.
 IV. Appellant's sentence is contrary to law and violative of due process because the trial court failed to consider whether the sentence was consistent with the sentences imposed for similar crimes committed by similar offenders and because a maximum sentence of five years is inconsistent with such sentences.
 V. Appellant was deprived of his liberty without due process of law when he was sentenced under a judicially altered, retroactively applied, and substantially disadvantageous statutory framework." *Page 1