DECISION AND JUDGMENT ENTRY
{¶ 1} A Scioto County jury convicted David Dyer of four drug offenses, two of which carried an enhancement for occurring in the vicinity of a juvenile, and one count of possession of a weapon while under a disability. These charges stemmed from a controlled drug purchase made by the Portsmouth Police Department. Following this controlled buy, police executed a search warrant at Dyer's house and found four bottles of illegal drugs hidden in a chicken coop.
 {¶ 2} First, Dyer argues the trial court improperly defined and amplified the phrase "beyond a reasonable doubt" in its jury instructions and thereby reduced the State's burden of proof to clear and convincing evidence. Because the jury instruction taken as a whole adequately conveyed the concept of reasonable doubt, it did not amount to either structural or plain error. *Page 2 
 {¶ 3} Second, Dyer argues the trial court erred in providing an instruction on complicity when the evidence demonstrated only that Dyer had been the principal offender. However, Dyer presented evidence and attempted to convince the jury that the drugs found on his property belonged to his son. Because the evidence presented at trial could reasonably be found to prove that Dyer had supported, assisted, or cooperated with his son in drug trafficking, the trial court did not err in instructing the jury on the crime of complicity.
 {¶ 4} Third, Dyer argues there was insufficient evidence for the jury to find that a statutory enhancement applied based on his engaging in drug trafficking within 100 feet of a juvenile. Because there is no evidence that Dyer's granddaughter was within 100 feet of Dyer at the time he committed the crime of drug trafficking, and because there is no evidence that any juvenile came within 100 feet of the chicken coop where Dyer stored his drugs, the State has failed to prove beyond a reasonable doubt that any drug trafficking occurred in the vicinity of a juvenile. Because there was insufficient evidence supporting the enhancement of the drug trafficking offenses, we reverse those parts of his convictions.
 {¶ 5} Finally, Dyer argues that the prosecution made multiple improper comments during its closing arguments. However, examining the State's closing arguments in their entirety, we do not believe that Dyer has been deprived of a fair trial or that the trial court committed plain error in not sua sponte addressing the State's remarks. Given the evidence of Dyer's guilt, we do not believe the prosecutor's remarks violated his substantial rights. *Page 3 
 I. Facts {¶ 6} On December 7, 2006, Detective Steven Timberlake of the Portsmouth Police Department set up a controlled buy of oxycodone from David Dyer using a confidential informant. Timberlake drove the informant to Dyer's house in Scioto County, and he watched the informant walk over and talk to Dyer in his driveway. After completing the transaction, the informant returned to the car and gave Timberlake a 40 mg oxycodone tablet. Timberlake testified that he did not witness the informant give Dyer the money or see Dyer give the informant the oxycodone, nor did he see any children near Dyer at the time of the controlled purchase.
 {¶ 7} That same day, Timberlake and Officer Todd M. Bryant obtained a search warrant and returned to Dyer's property. As they approached Dyer's house, they fell in behind Dyer as he drove home with Robert McClary and Dyer's granddaughter. Timberlake and Bryant first went to the rear of the property and followed a set of tracks in the snow that led to a building that appeared to be a chicken coop. There, Timberlake and Bryant found four bottles labeled as four different brands of over-the-counter medication. However, inside those bottles, the detectives found oxycodone, morphine, diazepam, marijuana, and cocaine. Inside Dyer's bedroom dresser in the house, police found a bottle of medicine prescribed for McClary that contained 10 mg hydrocodone, a painkiller. McClary testified that he often stayed at Dyer's house for extended visits and that he and Dyer had placed the bottle in the dresser to keep it out of reach of Dyer's granddaughter who, according to McClary, was visiting that weekend. Police retrieved Dyer's keys and unlocked a storage building, where they found a .410 shotgun. They found shells for the shotgun in the kitchen. Bryant testified that one *Page 4 
room in Dyer's house had a child's bed, toys, and clothing. The next day, police executed a search warrant at Dyer's sister's house. There, police found large amounts of money hidden in the toolbox of a tractor and in the refrigerator, as well as a set of digital scales hidden in the garage.
 {¶ 8} The State charged Dyer with one count of trafficking in oxycodone in the vicinity of a juvenile, a violation of R.C.2925.03(A)(2)[1] and (C)(1)(d) and a first-degree felony, one count of possession of oxycodone, a violation of R.C. 2925.11(A) and (C)(1)(c) and a second-degree felony, one count of trafficking in morphine in the vicinity of a juvenile, a violation of R.C. 2925.03(A)(2)[2] and (C)(1)(c) and a second-degree felony, one count of possession of morphine, a violation of R.C. 2925.11(A) and (C)(1)(b) and a third-degree felony, one count of possession of cocaine, a violation of 2925.11(A) and (C)(1)(a) and a fifth-degree felony, and one count of possession of a weapon while under a disability, a violation of R.C.2923.13(A)(3) and a third-degree felony. After, the jury found Dyer guilty on all charges, Dyer filed this appeal.
 II. Assignments of Error {¶ 9} Dyer presents four assignments of error:
 1. "The court below denied Mr. Dyer due process of law and a fair trial when it expanded the definition of beyond a reasonable doubt to permit conviction on clear and convincing evidence, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Art. I, §§ 10 and 16 of the Ohio Constitution. [Record, 358 — 359, 362]"
 2. "The court below erred when it denied the Defendant's Motion for a Judgment of Acquittal under Rule 29 as there was insufficient evidence to *Page 5 
support the allegation that any drug transaction occurred within 100 feet of a juvenile or that the drug trafficking was more than five times bulk amount. In the alternative, the jury's verdicts on these issues were against the manifest weight of the evidence."
 3. "The court below erred when it instructed the jury on both aiding and abetting and complicity, since neither was charged in the indictment nor was either supported by the evidence adduced at trial, and thus denied Mr. Dyer a fair trial and due process of law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution. [Record, 356 — 358, 367]"
 4. "The prosecutor engaged in misconduct that denied Mr. Dyer a fair trial and due process of law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution. [Record, 313 — 348]"
 III. Jury Instructions {¶ 10} Because Dyer's first and third assignments of error challenge the trial court's instructions to the jury, we address them together.
 {¶ 11} We have previously set out our standard of review regarding a trial court's jury instructions:
 The law requires a trial court to give the jury all instructions that are relevant and necessary for the jury to properly weigh the evidence and reach their verdict as the fact finder. State v. Comen (1990), 50 Ohio St.3d 206, 443 N.E.2d 640, paragraph two of the syllabus. The jury instructions "must be based upon the actual issues in the case as presented by the evidence." State v. Tompkins (Oct. 25, 1996), Clark App. No. 95-CA-0099, 1996 WL 612855, citing State v. Scimemi (June 2, 1995), Clark App. No. 94-CA-58, 1995 WL 329031. Where it is possible that "reasonable minds might reach the conclusion sought by the specific instruction" the court must provide guidance to the jury. See Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. While the actual wording of the charge is left to the court's discretion, the need for an instruction presents a question of law. Id.
State v. Monroe, Scioto App. No. 05CA3042, 2007-Ohio-1492, at ¶ 50. Furthermore,
 [W]hen we review a trial court's jury instructions, we must consider the jury instructions as a whole, rather than viewing an instruction in isolation, and *Page 6 
then determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights. See Becker v. Lake Cty. Mem. Hosp. West (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165; see, also, State v. Coe, 153 Ohio App.3d 44, 790 N.E.2d 1222, 2003-Ohio-2732. We must not reverse a conviction due to error in the jury instructions unless the error is so prejudicial that it may induce an erroneous verdict. See Parma Hts. v. Jaros (1990), 69 Ohio App.3d 623, 630, 591 N.E.2d 726; State v. Speakman (Mar. 27, 2001), Pickaway App. No. 00CA035, 2001 WL 315198.
State v. Ward, 168 Ohio App.3d 701, 2006-Ohio-4847, 861 N.E.2d 823, at ¶ 29.
 A. Instruction on Reasonable Doubt {¶ 12} In his first assignment of error, Dyer argues that the trial court improperly defined the State's burden of proof, "beyond a reasonable doubt," by conflating that definition with the definition of clear and convincing evidence, thus reducing the State's burden of proof. In its jury charge, the trial court explained:
 Reasonable doubt is present when jurors, after they have carefully considered and compared all the evidence, cannot say that they are firmly convinced of the truth of the charge. It is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence open to some possible or imaginary doubt.
 Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs. [If, a]fter a full and impartial consideration of all of the facts, you do have a present, firm conviction of the truth of the charge, the State has proven its case to you beyond a reasonable doubt and you must then find the defendant guilty regardless of your personal feelings, or however distasteful such verdict may be to you. It is your sworn duty to render a true verdict. However, if you do not have such a firm conviction of the truth of the charge, you must then find the defendant not guilty * * *.
 * * *
 If, after a full and impartial consideration of all of the facts, you do have a present, firm conviction of the truth of the charge, the State has then proven its case to you beyond a reasonable doubt and you must then find the defendant guilty regardless of your personal feelings, or however *Page 7 
distasteful such verdict may be to you. It is your sworn duty to render a true verdict. However, if you do not have a conviction of the truth of the charge, you must then find the defendant not guilty * * *
(Emphasis added.) Dyer argues that this definition "expressly authorized the jury to convict on clear and convincing evidence. The language used by the court to define reasonable doubt — `a firm conviction of the truth of the charge' — is nearly a verbatim quote from the pattern jury instruction defining clear and convincing evidence: `a firm conviction about the truth of the matter.'"
 {¶ 13} The trial court's definition of reasonable doubt largely tracked the statutory definition set forth in R.C. 2901.05(D), which the Supreme Court of Ohio has explained "correctly conveys the concept of reasonable doubt and is not an unconstitutional dilution of the state's burden to prove guilt beyond a reasonable doubt." State v. Hoffner,102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 61. R.C. 2901.05(D) provides that
 "[r]easonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs."
However, the trial court amplified that definition by suggesting that having a "present, firm conviction of the truth of the charge" represents proof beyond a reasonable doubt rather than explaining what does not represent proof beyond a reasonable doubt: "[not being able] to say they are firmly convinced of the truth of the charge." Dyer argues that the failure of the trial court to properly instruct the jury on the meaning of reasonable doubt constituted structural error. *Page 8 
 {¶ 14} As the Supreme Court of Ohio recently explained in State v.Wamsley, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, at ¶ 15, there are
 "two types of constitutional errors that may occur in the course of a criminal proceeding — `trial errors,' which are reviewable for harmless error, and `structural errors,' which are per se cause for reversal. * * * Trial error' is `error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' * * * `Structural errors,' on the other hand, `defy analysis by "harmless error" standards' because they `affect[ ] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself.' Consequently, a structural error mandates a finding of `per se prejudice.'"
(Quoting State v. Fisher, 99 Ohio St.3d 127, 2003-Ohio-2761,789 N.E.2d 222, at ¶ 9, quoting in turn Arizona v. Fulminante (1991), 499 U.S. 279,309-10, 111 S. Ct. 1246, 113 L.Ed.2d 302 (alterations in original; internal citation omitted). However, the Supreme Court of Ohio has cautioned that, "`"if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional] errors that may have occurred are subject to harmless-error analysis."'" Wamsley at ¶ 15, quoting State v. Hill
(2001), 92 Ohio St.3d 191, 197, 749 N.E.2d 274, quoting in turn Rose v.Clark (1986), 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L.Ed.2d 460. Given the presumption that errors are not structural, courts have found an error to be structural "and thus subject to automatic reversal only in a `very limited class of cases.'" Id., quoting Johnson v.United States (1997), 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L.Ed.2d 718. However, the Supreme Court of the United States and the Supreme Court of Ohio have recognized that a constitutionally deficient instruction on the meaning of reasonable doubt constitutes a structural error.Sullivan v. Louisiana (1993), 508 U.S. 275, 281-82, 113 S. Ct. 2078,124 L.Ed.2d 182; State v. Perry, 101 Ohio St.3d 118, *Page 9 2004-Ohio-297, 802 N.E.2d 643, at ¶ 18 (citing Sullivan). Thus, we must determine whether the jury instruction on reasonable doubt amplifying the statutory definition is constitutionally deficient.
 {¶ 15} The Supreme Court of Ohio has advised trial courts against amplifying the definition of reasonable doubt. State v. Van Gundy
(1992), 64 Ohio St.3d 230, 235, 594 N.E.2d 604. However, in VanGundy, the court held that an instruction nearly identical[3] to the one given by the trial court, "taken as a whole, was not prejudicial and did correctly convey the concept that the state must prove defendant's guilt beyond a reasonable doubt." Id. Based upon its holding that the amplification in Van Gundy did not erroneously define or distort the definition of reasonable doubt, the court implicitly held that the jury instruction in that case passed constitutional muster. In order for an error to be structural, it must be a constitutional error. SeePerry at ¶ 19 ("`[T]he trial error/structural-error distinction is irrelevant unless it is first established that constitutional error has occurred.'" (quoting State v. Esparza (1996), 74 Ohio St.3d 660, 662,660 N.E.2d 1194.). Therefore, we conclude that the trial court's amplification of the definition of reasonable doubt in this case, which is substantially similar to the definition upheld in Van Gundy, does not constitute structural error.
 {¶ 16} Similarly, we conclude that the trial court's definition of reasonable doubt does not constitute plain error. For there to be plain error, there must be a plain or obvious error that "affect[s] `substantial rights,' which the court has interpreted to mean *Page 10 
`but for the error, the outcome of the trial clearly would have been otherwise.'" State v. Litreal, 170 Ohio App.3d 670, 2006-Ohio-5416,868 N.E.2d 1018, at ¶ 11, quoting State v. Barnes (2002), 94 Ohio St.3d 21,27, 2002-Ohio-68, 759 N.E.2d 1240. Because the trial court's definition of reasonable doubt did not erroneously define the term, Van Gundy,64 Ohio St.3d at 235, 594 N.E.2d 604, there is no plain error.
 {¶ 17} Accordingly, we overrule Dyer's first assignment of error.
 B. Instruction on Complicity {¶ 18} In his third assignment of error, Dyer argues that the trial court erred in instructing the jury on complicity when the evidence presented at trial does not support those instructions. In support of this proposition, he relies on State v. Woods (1988), 48 Ohio App.3d 1,7, 548 N.E.2d 954, which held that the court errs in giving instructions on complicity where the evidence presented at trial proves only that the defendant could be charged as the principal offender. He also relies onState v. Smith, Cuyahoga App. No. 86690, 2006-Ohio-3156, at ¶ 66, for the proposition that an instruction on complicity "would only be proper * * * if there were sufficient evidence in the record to establish complicity." Id.
 {¶ 19} Again, we note that "the need for a jury instruction presents a question of law." Monroe at ¶ 50. "When the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor, a jury instruction by the trial court on that subject is proper." State v. Perryman (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph five of the syllabus, vacated in part on other grounds byPerryman v. Ohio (1978), 438 U.S. 911, 98 S. Ct. 3136, 57 L.Ed.2d 1156. "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the *Page 11 
evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson (2001), 93 Ohio St.3d 240,2001-Ohio-1336, 754 N.E.2d 796, at the syllabus.
 {¶ 20} We believe the evidence warranted a jury instruction on complicity. In State v. Lamarr, Logan App. No. 8-04-39, 2005-Ohio-6030, at ¶¶ 12-15, the Third District upheld a complicity jury instruction based on evidence that the defendant sold cocaine to an undercover informant, the defendant lived in the apartment where the controlled buy had been made, and the police found the defendant, cocaine, drug paraphernalia, and cash in the apartment on executing a search warrant. According to the court, the evidence was capable of being interpreted two ways: that the defendant was selling cocaine to two others at the time of the raid or, alternatively, that the defendant was acting as a conduit for two other drug suppliers. The court concluded that there was sufficient evidence that the defendant "`supported [or] assisted * * * the principal in the commission of the crime.'" Id. at ¶ 15, quotingJohnson at ¶ 30 (alteration in original). Similarly, in State v.Kidd, Lake App. No. 2006-L-193, 2007-Ohio-4113, at ¶ 54, the Eleventh District held that an instruction on aiding and abetting was appropriate where the defendant allowed a drug transaction to occur on property that she controlled. The court explained that "[t]he evidence demonstrated that Kidd rented, controlled, and had sole responsibility for the apartment wherein the trafficking and manufacturing of crack cocaine took place. If, for the sake of argument, Kidd's role in *Page 12 
these activities was nothing more than allowing them to occur in the apartment, she could be found guilty of complicity.").
 {¶ 21} At trial, Dyer attempted to show that the drugs found in the chicken coop belonged to someone else. To that end, the defense introduced evidence that Dyer's son, Harold Dyer, had lived at Dyer's house in the months preceding the execution of the search warrant at Dyer's house and that Harold Dyer had been indicted for possession of oxycodone, morphine, and cocaine, and trafficking in oxycodone. Dyer also presented evidence that his son had plead guilty to one count of drug possession and one count of drug trafficking. Furthermore, trial counsel argued that Harold Dyer had the same type of drugs as those found by police and suggested that the son had left the drugs in the chicken coop. The State presented evidence that Dyer sold an oxycodone tablet to an undercover informant and that Dyer had retrieved the tablet from the chicken coop. Police found the drugs in the chicken coop and the money used to purchase the drugs on Dyer.
 {¶ 22} Dyer attempted to create a reasonable doubt of his guilt by arguing that his son was the principal offender. The evidence adduced at trial could reasonably be construed to have proven Dyer supported, assisted, or cooperated with his son to traffic drugs by storing the drugs for him or allowing the son to hide them in the coop. Therefore, we overrule his third assignment of error.
 IV. Drug Trafficking in the Vicinity of a Juvenile {¶ 23} In his second assignment of error, Dyer argues that the trial court erred in denying his motion for a judgment of acquittal on the two counts of drug trafficking *Page 13 
within the vicinity of a juvenile. In the alternative, Dyer contends that the jury's verdicts on these two counts are against the manifest weight of the evidence.
 {¶ 24} Dyer argues that the State failed to produce sufficient evidence to allow the trial court to submit the case to the jury. Our standard of review is familiar: "`[w]hen reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court's role is to examine the evidence admitted at trial to determine whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" State v. Nayar, Lawrence App. No. 07CA6, 2007-Ohio-6092, at ¶ 13, quoting State v. Simms,165 Ohio App.3d 83, 2005-Ohio-5681, 844 N.E.2d 1212, at ¶ 9, citingState v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" Id., quoting Simms at ¶ 9, citing in turn Jenks, supra. Our evaluation of the sufficiency of the evidence raises a question of law and does not permit us to weigh the evidence.Simms at ¶ 9, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 25} Here, the State had to prove that Smith 1) knowingly, 2) prepared for distribution, 3) a controlled substance, 4) knowing that the controlled substance was intended for sale or resale by the offender or another person. R.C. 2925.03. For an enhancement of the degree of the crime to apply, the State also had to prove that the quantity of drugs exceeded five times bulk amount and that the crime charged was committed in the vicinity of a juvenile. R.C. 2925.03 (C)(1)(c); R.C.2925.03(C)(1)(d). *Page 14 
 A. Bulk Amount {¶ 26} Dyer argues that the State failed to prove count three of the indictment, trafficking in morphine in the vicinity of a juvenile, a violation of R.C. 2925.03(A)(2) and (C)(1)(c) and a second-degree felony, because there was no evidence that Dyer had more than five times the bulk amount in morphine. R.C. 2925.01(d)(1)(D) defines "bulk amount," in pertinent part, as:
 An amount equal to or exceeding twenty grams or five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual of a compound, mixture, preparation, or substance that is or contains any amount of a schedule II opiate or opium derivative * * *.
Through its expert, Pharmacist Troy Gahm, the State presented evidence that the morphine tablets seized from Dyer are Schedule II controlled substances, that the "maximum daily dose" of morphine is 180 milligrams,[4] and that Dyer had 2,600 milligrams of morphine. Because there is sufficient evidence that Dyer had more than five times the bulk amount of morphine, we reject this part of his second assignment of error.
 B. Drug Trafficking in the Vicinity of a Juvenile {¶ 27} The Revised Code defines a transaction "in the vicinity of a juvenile" as one that occurs within 100 feet of a juvenile or within a juvenile's view. R.C. 2925.01(BB). Dyer argues that there is no evidence in the record showing that the child ever came within 100 feet of where he stored the drugs in the chicken coop. Officer *Page 15 
Bryant testified that the chicken coop was "maybe 100 feet [from the house], * * * maybe a little more, little less." On cross-examination, Bryant admitted that he had not measured the distance from the house to the chicken coop, and he stated that, if he were told that the distance was 120 feet, he "could not disagree with that." Further, there is no evidence that a child was present during the controlled buy or that the child had ever come within 100 feet of any drug transaction.
 {¶ 28} The State argues that "[t]he distance to the chicken coop where the drugs were being stored is irrelevant." Instead, it argues that a rational trier of fact could find that Dyer had trafficked in drugs in the home and within the vicinity of the juvenile based on the sale of the oxycodone to the informant, the storage of the drugs in the chicken coop, "the presence of the juvenile as a resident in the house, the juvenile's clothing in one of the bedrooms, the presence of the child at the execution of the search warrant, the [prescription] drugs found in Appellant's dresser drawer, and other children's items in the house." We disagree.
 {¶ 29} The State must prove beyond a reasonable doubt that Dyer's granddaughter was within 100 feet of the transactions constituting drug trafficking in order for the enhancement to apply. The State does not point to any evidence in the record showing that the prescription drugs belonging to McClary were connected to drug trafficking or that Dyer ever brought any illegal drugs into the house. We acknowledge that Officer Bryant testified, "I guess for a single man raising his granddaughter he kept [the house] pretty clean" and there was evidence that the child had a bedroom, clothing, and toys at his house. However, this evidence does not prove that the child was with Dyer or within 100 feet of him when he committed the crime of *Page 16 
drug trafficking. In fact, McClary testified that, at the time the police executed the search warrant at Dyer's house, they had just returned from picking up the child.
 {¶ 30} The State relies on State v. Flores, Wood App. Nos. WD-04-012 and WD-04-050, 2005-Ohio-3355, and State v. Fannin, Cuyahoga App. No. 80014, 2002-Ohio-4180, for the proposition that a child's residence with the defendant suffices to prove that the offense occurred in the vicinity of the juvenile. In Flores, the Sixth District held that evidence that the children resided in the same house as the accused and that some of the children's items were found near drug paraphernalia sufficed to prove that the offense had been committed in the vicinity of the child. The defendant in that case apparently committed the offense in the house where children resided while they were present, as police saw the children leaving the house at the time they executed the warrant and a search revealed the accused in the house along with drugs and items connected to drug trafficking. In contrast, Dyer's granddaughter arrived at the scene at the same time that police executed the warrant. All the evidence indicates that Dyer committed the charged offenses prior to the search and before the child was with him. The record contains no evidence from which the jury could infer the child was with Dyer at the time of the drug purchase. Although Bryant testified that he believed that Dyer was raising his granddaughter, he did not testify to any facts that suggest that the child was with Dyer always or at the time of the charged offenses. Police found none of the illegal drugs that are the basis of the charges or any drug paraphernalia in Dyer's house. Thus, no circumstantial evidence shows that the child was in the vicinity of Dyer at the time he trafficked drugs, and Flores is clearly distinguishable. *Page 17 
 {¶ 31} In Fannin, the only question was whether the State had to present testimony proving the age of the children who were in the house and whether the State had to prove that the accused had knowledge of their age before his drug trafficking offense could be enhanced.Fannin at ¶¶ 111-23. Furthermore, the facts of Fannin are distinguishable. There, the State presented evidence showing that the children lived in the residence where the drug trafficking occurred and that there were large quantities of drugs, cash, and drug paraphernalia, including bags for distributing drugs, in the residence. Id. at ¶ 8. There was evidence that drug trafficking had been occurring when police executed the warrant and that the children were present at that time. Again, in contrast, no illegal drugs or drug paraphernalia were found in Dyer's house, and there is no evidence that drug trafficking occurred while the child was in the vicinity.
 {¶ 32} The State had the burden to prove beyond a reasonable doubt that Dyer's granddaughter was in the vicinity while he committed the drug trafficking offenses. However, there is no evidence that the child was ever within 100 feet while Dyer committed the charged offenses. Nor is there evidence that the drug trafficking offenses occurred within the child's view. Therefore, we sustain Dyer's second assignment of error.
 IV. Prosecutorial Misconduct {¶ 33} In his fourth assignment of error, Dyer argues that the prosecution engaged in prosecutorial misconduct during closing arguments. In particular, he asserts that the prosecution argued facts not admitted into evidence, made improper statements of personal belief, and made a "send a message" argument about local "community standards." *Page 18 
 {¶ 34} "A prosecutor's remarks constitute misconduct if the remarks were improper and if the remarks prejudicially affected an accused's substantial rights." State v. Williams, 99 Ohio St.3d 439,2003-Ohio-4164, 793 N.E.2d 446, at ¶ 44, citing State v. Smith (1984),14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. State v. Lott (1990), 51 Ohio St.3d 160, 166,555 N.E.2d 293. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Gapen, 104 Ohio St.3d 358,2004-Ohio-6548, 819 N.E.2d 1047, at ¶ 92, quoting Smith v. Phillips
(1982), 455 U.S. 209, 219, 102 S. Ct. 940, 71 L.Ed.2d 78. We must "view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." State v. Treesh (2001),90 Ohio St.3d 460, 466, 739 N.E.2d 749.
 {¶ 35} Because Dyer failed to object at trial to the allegedly improper comments by the prosecution, he has waived all but plain error. Crim. R. 52(B); State v. Slagle (1992), 65 Ohio St.3d 597, 604,605 N.E.2d 916. "We may invoke the plain error rule only if we find (1) that the prosecutor's comments denied appellant a fair trial, (2) that the circumstances in the instant case are exceptional, and (3) that reversal of the judgment below is necessary to prevent a miscarriage of justice."State v. McGee, Washington App. No. 05CA60, 2007-Ohio-426, at ¶ 15, citing State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
 A. Arguing Facts Not in Evidence {¶ 36} Dyer argues that the prosecutor argued facts not in the record when she stated that "Bryant said that the reason [the informant and Dyer] went inside the house *Page 19 
was so this defendant could check him for a wire, listening device, recording device." Dyer notes that Bryant testified that he did not see this occur because he had stayed out of sight and a distance from Dyer's house. However, Bryant testified during cross-examination by Dyer's attorney:
 [I]f you read the affidavit correct the affidavit indicates at that time I believed, I had believed that the transaction had occurred inside the residence where the [informant] and the defendant, Mr. Dyer, went inside when in fact, what actually occurred was Mr. Dyer searching the [informant] for a wire.
Although Dyer argues that "Officer Bryant speculated as to what happened because, by his own admission, he was unable to see anything[,]" Dyer did not object to this testimony or move to strike it from the record. Therefore, there was evidence substantiating the prosecution's statement, and this argument is meritless.
 {¶ 37} Dyer asserts that the prosecution's statement that "this little girl lives with the defendant" is not supported by the record because the State's "own witnesses said that they had no proof of that claim." He cites Officer Timberlake and Chief Charles H. Horner's testimony to show that these witnesses did not know that anyone lived with Dyer. However, Officer Bryant testified that Dyer's granddaughter lived with him, and there was evidence that the child had a room, clothes, and toys at his house. These facts created a reasonable inference that Dyer's granddaughter lived with him. Similarly, the prosecution's statement that "[t]he day to day operation of this illegal pharmacy took place in the presence of a juvenile" represented a reasonable inference based on the evidence that the child lived with Dyer at least some of the time. Whether the offense had occurred in the vicinity of a juvenile was one of the issues that the jury had to determine. *Page 20 
 {¶ 38} Dyer also challenges the prosecution's statements that Dyer put the drugs in the bottles, brought them to the chicken coop, and hid them there, arguing that there is no evidence in the record showing how the drugs got to the chicken coop, that there were no fingerprints on the bottles, and that no one saw Dyer put the drugs there. However, the State put forward evidence that Dyer sold oxycodone to an undercover informant and that Dyer walked to the chicken coop to retrieve the drugs. We believe this evidence allows the reasonable inference that Dyer put the drugs, among them oxycodone, in the bottles and hid them in the chicken coop.
 {¶ 39} Dyer contends the State argued facts outside the record in its effort to persuade the jury that the drugs did not belong to Appellant's son. The prosecutor stated that Harold Dyer, the son, "would not have been charged with felonies of the second degree if they hadn't gotten all of his dope." Dyer notes there was no testimony regarding the amount of drugs Harold Dyer ever possessed or that police seized all of his drugs on arresting him. We agree with Dyer that this statement was improper as it amounts to mere speculation by the prosecutor. Nonetheless, Dyer has failed to demonstrate that he has been prejudiced in any way. Here, the evidence showed that Dyer had retrieved oxycodone to sell to the informant from the chicken coop. The police watched Dyer walk toward the chicken coop during the drug transaction, and they found fresh footprints in snow showing that Dyer had at that time walked to the chicken coop. Given the evidence demonstrating that Dyer sold the drugs, we do not believe that the prosecution's comments deprived Dyer of a fair trial.
 {¶ 40} Dyer next challenges the State's argument that McClary's prescription drugs were in Dyer's dresser drawer "[b]ecause Lorisets go for $5.00 a piece on the *Page 21 
street * * *." Dyer complains that there was no evidence presented at trial regarding the street value of the drugs. However, with this statement, the State had attempted to show that Dyer's possession of McClary's prescription drugs was part of the operation of Dyer's "illegal pharmacy." McClary testified that these drugs were in Dyer's dresser because he wanted to keep them out of reach of Dyer's granddaughter. However, McClary admitted that, although he brought only a seven-day supply of his other medications, he brought his whole bottle of the Lorisets. Answering why McClary brought his whole bottle, the State argued it was ""[b]ecause Lorisets go for $5.00 a piece on the street and let me suggest to you heart medication doesn't." Here, Dyer was charged with trafficking in prescription drugs, and we believe that the State could reasonably draw inferences suggesting that the Lorisets were part of that scheme. Although the State did argue a fact not in evidence, Dyer has not shown that placing an actual street value on the Lorisets in itself prejudiced him. Again, looking at the entire record and given the evidence supporting Dyer's guilt, we cannot say that the prosecution's comments deprived Dyer of a fair trial.
 {¶ 41} Dyer also argues that the prosecution engaged in misconduct when it referred to an incident in 1995 where Dyer allegedly handed his then-fourteen-year-old-son Harold Dyer morphine when police executed a search warrant at his house. He argues that there is no evidence in the record supporting this statement. However, on cross-examination, counsel for Dyer asked Officer Bryant if Harold Dyer was a drug dealer. Bryant answered: "He's a product of his father. I don't know what to tell you there. I think his father is the one that got him started in it back in `95 when he handed him the morphine pills then." Dyer did not object or move to strike. Therefore, there *Page 22 
was evidence in the record supporting the prosecutor's statement. Similarly, this testimony support's the prosecution's use of the clichè "Like father, like son" to describe its theory of the case. Here, Dyer attempted to shift blame for possession of the drugs in the chicken coop onto his son, notwithstanding evidence that Dyer had participated in a controlled drug buy. The State used this phrase to characterize its theory of the case that Dyer was a drug dealer who had introduced his son to drugs and was therefore responsible for his drug dealing. The evidence presented at trial sufficiently supports the State's use of this theory.
 B. Other Acts {¶ 42} However, Dyer also contends that the argument regarding Dyer's prior run-in with police in 1995 and his giving morphine to his son to hold is improper "other acts" evidence. We agree that this "other acts" evidence is objectionable. We have previously explained that other acts evidence is never admissible when its sole purpose is to establish that the defendant committed the act alleged of him in the indictment.State v. Jones, Scioto App. 06CA3116, 2008-Ohio-968, ¶ 38. The record does not show that any of the exceptions to this rule listed in Evid. R. 404(B) apply. Nonetheless, looking at the entire record and given the evidence supporting Dyer's guilt, we cannot say that the prosecution's comments deprived Dyer of a fair trial or that "a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different." Jones at ¶ 28. Thus, we do not find any plain error. Nonetheless, we note that had there been an objection at trial, testimony such as that made by Officer Bryant referring to other acts of such a prejudicial nature could *Page 23 
have warranted a mistrial. The State would be wise to advise its witnesses to avoid "poisoning" the trial by such tactics.
 C. Improper Expressions of Opinion {¶ 43} Dyer argues that the prosecutors improperly expressed their opinion regarding several issues. In closing arguments, the State questioned the defense theory that Harold Dyer, rather than the defendant, had hidden the drugs in the chicken coop. It asked the jury, "Do you really believe and would you really entertain for one second that while Harold Dyer is jumping all over Scioto County running from the bondsman that he's going to leave $7,000.00 worth of dope just sitting in the chicken coop? I don't think so." The State also commented on the amount of cash found on Mr. Dyer when police searched him: "For that matter, how many of you walk around with a thousand, two thousand, three thousand dollars in your pocket? I don't have that in my pocket and I can guarantee you that I have never seen that in my pocket." Similarly, in commenting on the large amount of cash found in a tractor toolbox, the prosecutor stated: "Isn't that where you keep your cash? That's where mine is."
 {¶ 44} "`A prosecutor may state his opinion if it is based on the evidence presented at trial.'" State v. Williams (2003),99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 46, quoting State v.Watson (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97. In Williams, although the court held that it was improper for a prosecutor to preface his comments on the evidence with "I believe" and "I think," doing so did not deprive the defendant of a fair trial where "the prosecutor simply argued what the evidence established either directly or by fair inference." Id. Here, the prosecutor improperly personalized her comments about the what the evidence showed. Nonetheless, in each *Page 24 
of these comments, the prosecutor commented on the reasonableness of several defense theories put forward at trial: that Harold Dyer had abandoned a large amount of valuable drugs and that the money found during the searches was not drug money but instead represented savings because of Dyer's distrust of banks. Phrased properly, this commentary would have been legitimate, and we do not believe that Dyer has demonstrated that the prosecutor's personalization of her commentary on the evidence prejudiced him or denied him a fair trial. See State v.Gibson, Highland App. No. 03CA1, 2003-Ohio-4910, at ¶ 39, ("Thus, when `the opinion statement is based upon the evidence admitted in the case, the defendant suffers no prejudice.'" (quoting State v. McComas (Feb. 15, 1996), Lawrence App. No. 93CA32)).
 D. "Send a Message" and "Community Standards" Arguments {¶ 45} Next, Dyer argues that the State's closing argument "concluded with a blatant appeal to the jury's sense of civil duty and emotion." In closing, the prosecutor argued:
 Each of you as members of the jury are here to decide for this community what the tolerance policy is on drugs [and] drug trafficking. Now Mark Kuhn, the prosecuting attorney[,] has been elected by the public, and has chosen a no tolerance policy on drugs. That's why we're here today, because we chose to take this case to the grand jury. The grand jury obviously chose a no tolerance policy as well. The case was indicted, and now it is up to you to decide what that tolerance policy is. There's probably not a one of you who doesn't know someone or hasn't experienced what drug trafficking has done to this community. Probably not a one. So what's the tolerance for that? Is it okay, are we just going to tolerate the fact that this man[ ] goes out and feeds poison to everybody in the community [and] when the officers show up he says "I don't know anything about it, not in my house, don't know anything about it"?
 Ladies and gentlemen of the jury, tell them there is a no tolerance policy on drug trafficking in this county and you do that by finding him guilty on all counts. *Page 25 
Similarly, in rebuttal, the State argued: "You become the decision makers in this case. You speak what's right and wrong in this case. You speak for the community. * * * Ladies and gentlemen, speak. Speak to the drug pushers. Speak to the community. Speak justly, but speak firmly."
 {¶ 46} The State relies on State v. Edgington, Ross App. No. 05CA2866,2006-Ohio-3712, at ¶¶ 22-23, in which we held that it was not improper for the prosecution to argue for the jury to consider "what are the most important of our affairs. Is it not the safety of those in our community and their freedom from sexual assault of this nature[?]" In particular, we explained:
 Viewing the prosecutor's closing arguments as a whole, we cannot find that these statements improperly encouraged the jury to abandon their position of impartiality by placing themselves in the position of rape victims or by linking the safety of the community as a whole to Edgington's guilt. In both of his closing arguments, the prosecutor asked the jury to consider the evidence adduced at trial, and apply it to the elements of the crime charged. The prosecutor specifically acknowledged the seriousness of the charge, the state's substantial burden of proof, and the importance of courts and trials to decide criminal cases based upon the evidence presented at trial.
Id. at ¶ 23 (emphasis added). We relied on the Supreme Court of Ohio's holding in State v. Lorraine (1993), 66 Ohio St.3d 414, 419-20,613 N.E.2d 212, that "[a] request that the jury maintain community standards is not equivalent to the exhortation that the jury succumb to public demand." Thus, we concluded that the impact of the prosecution's argument was to convict the defendant because the evidence proved him guilty, not because community standards demanded it. Similarly, inState v. Tackett, Scioto App. No. 06CA3103, 2007-Ohio-6620, at ¶ 32, we held that the prosecution does not commit misconduct by referring to "community standards." *Page 26 
 {¶ 47} In this case, the State went farther than merely referencing community standards. Here, the prosecutor's use of community standards was much more focused and excessive than in Edgington andTackett, rather than a vague reference as in those cases. Also, the prosecutor tied its appeal to community standards to each juror's experiences regarding the county's drug problem and to an exhortation for the jurors to "send a message" to the community and to those doing and selling drugs. "A prosecutor may not call for the jury to convict in response to public demand." State v. Hicks (1989), 43 Ohio St.3d 72, 75,538 N.E.2d 1030. In State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971,804 N.E.2d 433, at ¶ 181, the Supreme Court of Ohio held that an argument that urges the jury to speak to the community with their verdict, that references community outrage over a particular class of crime, and that tells the jury to "send a message" constitutes prosecutorial misconduct. Other Ohio courts have held that "send a message" arguments such as the one made by the State in this case are improper and can represent grounds for reversal. See State v.Grimes, Hamilton App. No. C-030922, 2005-Ohio-203, at ¶ 19 ("In a criminal prosecution, the state is not permitted to ask the jury to find the defendant guilty in response to public demand, commonly known as the `send a message' argument."); State v. Dixon (3rd Dist.),152 Ohio App.3d 760, 2003-Ohio-2550, 790 N.E.2d 349, at ¶ 28 ("In a criminal prosecution, the state is not permitted to ask the jury to convict in response to public demand, commonly known as the `send a message' argument."); State v. Garrett, Cuyahoga App. 80172, 2003-Ohio-274, at ¶ 60 (holding an argument to be improper "when the prosecutor * * * asks for justice, especially `justice for the family' of the deceased and justice `for the people of the State of Ohio."); State v. Draughn (5th Dist. 1992) *Page 27 76 Ohio App.3d 664, 671, 602 N.E.2d 790 ("[T]he prosecutor may not invite the jury to judge the case upon standards or grounds other than the evidence and law of the case. Thus, he cannot inflame the passion and prejudice of the jury by appealing to community abhorrence or expectations with respect to crime in general, or crime of the specific type involved in the case."). We agree that, where a "send a message" argument is not premised on the jury finding guilt beyond a reasonable doubt,Hicks, 43 Ohio St.3d at 75, 538 N.E.2d 1030, or does not serve to remind the jurors only of their roles as members of a civic body, State v.Williams, Cuyahoga App. No. 80615, 2002-Ohio-4423, at ¶ 23, such arguments constitute prosecutorial misconduct. We believe that the arguments raised in the State's closing arguments that invited the jury to convict Dyer to speak to the community and to drug dealers and to held solve the county's drug problems crossed this line.
 {¶ 48} However, Dyer did not object to this line of argument. Again, we view the State's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial.Treesh, 90 Ohio St.3d at 464, 739 N.E.2d 749. "An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." Id. Given the evidence of Dyer's guilt, we believe that the jury would have convicted him notwithstanding the State's prosecutorial misconduct. However, although we do not believe that the improper comments require reversal in this case, we caution the prosecutors in this case as the First District did inGrimes at ¶¶ 37-38:
 We are sending our own message: the comments in this case were improper. And absent the overwhelming state of the evidence, these *Page 28 
comments would have required us to reverse [the appellant's] conviction-mandating a costly retrial and the reliving of this crime by the victim's family. The fact that we are affirming the outcome does not make the state's remarks any less improper. * * * [W]e will not hesitate, when there is less than overwhelming evidence of guilt, to reverse a conviction based on these types of comments.
 D. Cumulative Effect {¶ 49} Finally, Dyer argues that "[w]hen the errors are as numerous as they were in this case, and as wide ranging as they were in this case, there is prejudice to the defendant." However, our analysis of each of Dyer's assertions of prosecutorial misconduct has required us to consider, based on the prosecutors' arguments in their entirety, whether Dyer received a fair trial. Although the prosecution made improper comments, we do not believe that these comments deprived him of a fair trial or prejudicially affected his substantial rights. Therefore, we overrule his fourth assignment of error and affirm the judgment below in part, reverse in part, and remand the cause for further proceedings consistent with this opinion.
 JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CAUSE REMANDED. *Page 30 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellant and Appellee shall split the costs.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J.: Concurs in Judgment and Opinion.
Kline, J.: Concurs in Judgment and Opinion as to Assignments of Error I, II, III, and Part of IV; Dissents in Part with Opinion as to Assignment of Error IV.
[1] The indictment, jury-verdict form, and sentencing entry reference the offense as a violation of R.C. 2925.03(A)(1) rather than R.C.2925.03(A)(2). However, the indictment and jury instructions make clear that Dyer was charged with drug trafficking by preparing for shipment, shipping, transporting, delivering, preparing for distribution, or distributing a controlled substance intended for sale or resale, a violation of R.C. 2925.03(A)(2). Dyer has raised no issue with this apparent typographical error.
[2] See supra note 1.
[3] The court in Van Gundy explains:
 The [trial] court then amplified upon this statutory language by instructing: "If after a full and impartial consideration of all the evidence you are firmly convinced of the truth of the charge, the state has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge, you must find the defendant not guilty."
Van Gundy, 64 Ohio St.3d at 231, 594 N.E.2d 604.
[4] In the record originally filed in this case, Gahm's testimony is that "[t]he maximum daily dose of morphine is 1280 milligrams." Dyer relies exclusively on this testimony to show that he did not have five times the bulk amount of morphine. However, the State filed an order from the trial court supplementing the record on the basis that there was a typographical error related to Gahm's testimony. We sua sponte ordered the record supplemented to correct this typographical error. Thus, the record reflects that Gahm's testimony was that the maximum daily dose of morphine was 180 milligrams, not 1280 milligrams. For this reason, we also reject Dyer's argument that the prosecution argued facts not in evidence when it argued that Dyer had five times the bulk amount of morphine. *Page 29